THOMAS A. McDONALD, RESPONDENT, v. BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUD-SON, APPELLANT.

Argued February 5, 1924—Decided May 19, 1924.

1. A supplement to an act of the legislature, by its enactment, becomes an integral part of the primary statute. Consequently, a further supplement, which modifies or alters the earlier one, is properly entitled a supplement to the primary statute, notwithstanding the fact that a large part of that statute (not includ-ing, however, the earlier supplement) has in the meantime been repealed.

2. A statute, the object of which is to prevent fraud at elections in counties of the first class, and which provides the machinery necessary for the accomplishment of that object, is a general law, its fundamental purpose being the protection of the rights of all the voters of the state. The fact that the machinery so provided is operative only in specified counties, and the further fact that the expense incurred in such operation is required to be borne by the taxpayers of those counties, do not render the statute special or local, within the meaning of the constitutional provision prohibiting the legislature from passing local or special laws regulating the internal affairs of towns and counties.

---

On appeal from the Supreme Court.

For the appellant, *John J. Fallon.*

For the respondent, *Robert H. McCarter* and *Arthur F. Egner.*

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The legislature of the state on the 28th day of February, 1923, passed an act entitled "A

further supplement to an act entitled 'An act entitled "An act to regulate elections" (Revision of 1898), approved April 4th, 1898.'" Chapter 9 of the laws of 1923. By this enactment the office of superintendent of elections in counties of the first class in this state was established and the duties of the office were prescribed. It was further provided that the said office should be filled by some suitable person to be appointed by the senate and general assembly of the state in joint meeting assembled; that the term of such office should be for five years; that the incumbent thereof should receive a salary of $5,000 per annum, to be paid by the county treasurer; that such superintendent should have authority to appoint a chief deputy and other subordinate officers and fix the salaries of his appointees, and that the salaries of the superintendent and of his employes, certified to and approved under his hand, should be paid semi-monthly by the county treasurer of the county in which such officer functioned. The legislature, under the authority of this statute, on the 23d day of March, 1923, held a joint meeting, and then and there appointed the respondent, Thomas A. McDonald, to the office of superintendent of elections for the county of Hudson, a county of the first class, and he a few days later appointed a chief deputy and such other subordinate officers as he deemed necessary for the purpose of insuring honest elections in this county, that being the primary object sought to be accomplished by the statute. He at the same time fixed the salaries of his appointees and certified them—as well as his own—to the county treasurer for payment. Payment being refused, for the reason that there were no moneys in the county treasury applicable thereto, McDonald then applied to the Supreme Court for a *mandamus* to compel the board of freeholders of the county to raise a special emergency fund for that purpose. An alternate writ was thereafter allowed by the Supreme Court, and upon the hearing a peremptory writ was ordered. *McDonald v. Board of Freeholders of Hudson,* 98 *N. J. L.* 386. Upon a review in this court the judgment of the Supreme Court granting the peremptory writ was reversed. *Ante p.* 170. The judgment

of reversal was entered at the November term, 1923, of this court, and some ten days later McDonald instituted the present proceeding by applying again to the Supreme Court, praying the allowance of an alternative writ, directed to the board of freeholders, requiring that body to make provision to pay his salary, and also the salaries of those appointed by him, for the fiscal year beginning January 1st, 1923, and to include the same in the budget for the fiscal year beginning January 1st, 1924; and further, to include in said budget for the fiscal year beginning January 1st, 1924, an appropriation to pay the salaries of McDonald and his appointees for that fiscal year, *i. e.,* the year beginning January 1st, 1924. An alternative writ was allowed, and the Supreme Court, upon a hearing of the matters involved, granted a peremptory writ, requiring the board of freeholders to make provision in their budget for the year 1924 for the payment of the salaries of McDonald and his appointees, both for the fiscal year beginning January 1st, 1923, and also for that beginning January 1st, 1924. The present appeal is taken by the board of freeholders from the judgment of the Supreme Court awarding this second peremptory writ.

The first ground upon which the appellant seeks to have the judgment of the Supreme Court reversed is that there is nothing in the state of the case to show that there was not in the office of the county treasurer at the time of the allowance of the peremptory writ sufficient moneys to pay the salaries of the respondent and his several appointees. The answer to this contention is twofold—*first,* that the former adjudication settled the question of the lack of funds to meet the charges upon the county treasury, so far as the salaries for the year 1923 are concerned, and the "budget" for the year 1924 had not yet been made up at the time of the allowance of the alternative writ; *second,* that return to that writ contains no averment that the county had on hand moneys which may be legally appropriated to the payment of these salaries, and, in the absence of such averment, the legal presumption is that the contrary is the fact.

The second ground of appeal is rested upon the assertion that the writ is misdirected—that it should have been directed to the county treasurer instead of to the board of freeholders. We consider this contention to be without merit, and for the reason stated in the opinion of the Supreme Court in dealing with it.

Next, it is argued that the act of February 28, 1923, under which the respondent was appointed superintendent of elections, is unconstitutional—first, because its object is not expressed in its title, and second, because it is special legislation regulating the internal affairs of counties.

The title of the act has already been quoted. The argument is that it expresses no object, for the reason that at the time of its enactment the revision of our Election law of 1898 had been repealed by a subsequent revision enacted in 1920, and that, therefore, there was nothing in existence to be supplemented. But this is not an accurate statement of the situation. The legislature in 1918 had passed a supplement to the General Election law as revised in 1898, and that supplement created the duties now required to be performed by superintendents of elections, and imposed the performance of those duties upon the prosecutors of the pleas of the several counties which came within the purview of the statute, and made provision for their compensation, as well as for the compensation of their appointees. This supplement of 1918, when enacted, become an integral part of the revision of the Election law of 1898. *Central Railroad Co. v. State Board of Assessors,* 75 *N. J. L.* 771. When the Revision of 1920 was enacted it did not repeal the whole of the Revision of 1898 as it existed, but excepted certain portions thereof from the repealing clause, and one of the excepted portions was that part of the existing statute which was infused into it by the supplement of 1918. That the legislature may repeal a portion of a statute without destroying the whole of it goes without saying, and the result of the partial repealer of 1920 was to leave the unrepealed portions of the Revision of 1898 still in force; that is to say, they still remained a part of our election laws, notwithstanding the enactment of the Revi-

sion of 1920. This being so, the title of the act of 1923 properly expressed the object of the enactment, *i. e.,* a supplement to the Revision of 1898 as it *then* existed.

The legislature, however, being apparently doubtful as to the validity of this title, passed a later statute in the same year, by which it was amended so as to more fully express the object of chapter 9. The amendment, however, was entirely unnecessary, as the original title conformed to the constitutional requirement; and we are, consequently, not presently interested in the contention of counsel for the appellant that it is beyond the power of the legislature to render valid an unconstitutional statute merely by amending the title thereof.

As to the second contention: That chapter 9 of the laws of 1923 is unconstitutional because it is a special law, regulating the internal affairs of the counties of Hudson and Essex alone, leaving the remaining counties of the state unaffected thereby. The answer to this contention is contained in the opinion of the Supreme Court in the original litigation between these parties relating to this subject-matter. It is there pointed out that the purpose of the statute is to provide for honest elections in counties of the first class; that it is a matter of the gravest importance to the people of the whole state that elections should be fairly and honestly conducted in every county of the state; that it is a matter of common knowledge that in sparsely-settled districts it is not necessary to provide expensive machinery in order to procure an honest expression of the popular will at the polls; that there is no need in such districts of that vigilance, supervision or regulation which is required in densely-populated municipalities; that, consequently, where a necessity arises to add to the machinery of government additional machinery in certain localities for the purpose of attaining purity in general elections, it is within the legislative power to supply such machinery without burdening other localities, which are not in need of it, with the expense of such machinery, and that the legislature was the sole judge whether the necessity existed in Essex and Hudson counties by reason of their

crowded districts and large population, and that its decision in that regard is not open to question. 98 *N. J. L.* 386. The purpose of the statute, as is indicated by the above statement, was to protect our citizens, no matter in what part of the state they might live, from being deprived of, or injured in, the enjoyment of their rights as voters by the corruption of the ballot-box in Hudson or in Essex county; and an act which undertakes to do this—that is, to provide for the purity of elections in the state by making it difficult to put into execution a scheme for the corruption of the ballot-box in any part thereof, and so partially destroy the value of the franchise of every voter in the state—is an act passed for the benefit of the whole state, and not one which merely regulates the internal affairs of the counties in which the act is made operative.

Lastly, it is contended that the statute comes within the constitutional interdict with relation to the enactment of special laws regulating the internal affairs of cities and counties, because of the fact that, by virtue of its provisions, the superintendent of elections has the power to appoint as many subordinates as he may deem advisable, and fix their compensation; that the financial burden thus placed upon the taxpayers of the counties where these officers function is almost necessarily variant, and that, consequently, the statute, in its essence, arbitrarily separates the so-called counties of the first class into two subclasses without any basis for such subclassification. *Freeholders of Passaic* v. *Stevenson,* 46 *N. J. L.* 173, is cited in support of this contention. In our opinion, the doctrine of that case is not applicable to the legislation now under consideration. It was there held that a statute which, under the guise of a general law, arbitrarily fixes the salaries of prosecutors of the pleas in certain designated counties of the state, without any regard to the population of those counties, or the service to be rendered by such public officers, and without any attempt to classify such counties on any other basis, violated the constitutional provision now appealed to. But no such conditions exist in the present suit. It is applicable to counties of the first class, *i. e.,* counties

having a designated population, and population is cognate to the object of the legislation. Assuming that the burden upon the taxpayers in the several counties constituting the class which will result from the enforcement of the statute will be variant, we have a situation almost identical with that presented in the case of *Freeholders of Hudson* v. *Clarke,* 65 *Id.* 271. There the contention was made that a statute which provided that thereafter sheriffs, surrogates and county clerks in counties of the first class—that is, counties having a certain specified population—should be paid annual salaries instead of by fees, and that they might appoint such deputies and assistants as they might deem necessary for the performance of the duties of their respective offices, and fix the compensation of such appointees, subject to the approval of the board of freeholders, was violative of the constitutional provisions now appealed to. We there held that the contention was without legal substance, and we so held, notwithstanding the fact that under that statute, as under the one now before us, the financial burden placed thereby upon the several counties affected by the legislation would almost necessarily be variant. The doctrine of that case is controlling so far as the point now under consideration is concerned.

The judgment under review will be affirmed.

MINTURN, J. (dissenting). I find it difficult to concur in the conclusion reached by the majority of the court, that the legislation under consideration is not special in character, and that it is not a regulation of the internal affairs of the two counties, which are specially subjected to its provisions, contrary to the interdiction of the constitution. Two counties of the state are segregated from the general classification of counties, and by this legislation are subjected to the electorial supervision of a legislative agent, whose salary is fixed by the legislature, and whose power to appoint inferior agents and officers is without limit, as to number, or restriction as to compensation, to be paid by the taxpayers of the two counties, thus segregated, without consideration and without question.

Acts of the legislature, designed to regulate the frame structure and machinery of local government, we have frequently held, when properly related thereto, may stand as a constitutional expression of the legislative discretion. *Van Riper* v. *Parsons,* 40 *N. J. L.* 1. But when it is proposed that legislation may be designed to impose upon any specially-selected political division of the people, an extraordinary tax or imposition of an arbitrary character, without the consent of the people, and against the will of their chosen representatives in the board of freeholders, I know of no acknowledged principle of American law, and no adjudication in this state, which can be reasonably invoked to support the procedure.

It is argued in support of the proposal that the regulation and control of elections are matters peculiarly within the province of the representatives of the state at large, and not a matter of peculiarly local concern, and that therefore the state may *nolens volens* segregate any county or counties, and impose upon them the financial burden of state regulation. It may be conceded that the subject of elections is peculiarly the concern of the state at large, but in that concession there is contained the implication that the expense of regulation must also be a matter of state assumption, otherwise we shall have in state administration the very evil which the constitutional inhibition sought to correct—the interference by special legislation, in the guise of general laws, with the internal affairs of towns and counties. If the legislature may arbitrarily and legally impose this burden upon the taxpayers of Hudson and Essex counties, why cease its exactions at county lines? Why not select the two largest cities of the counties and by a species of local regulation impose a supervisor, and a satrapy of lieutenants upon the municipalities, with their incidental burdens upon the local taxpayer? If the legislature may constitutionally exercise this arbitrary power upon these two counties, in electorial matters, why cannot the legislature, with equal logic and plausibility, exercise and apply its conceded general power over the subject of prohibition of those two counties, and impose prohibition

agents of like character and with like powers upon these counties, and thus segregating them from all the political subdivisions of the state, upon the theory of density or diversity of population, subject their people to such arbitrary burdens of taxation as the legislative agent may impose upon them.

The fact is that, in supporting this character of legislation, we are, in effect, paving the way, not only for the destruction of the basic American doctrine of home rule in fiscal affairs, and lodging that most important power in the hands of state representatives, who the constitution never intended should exercise it, to the exclusion of the citizens, whose property is thereby subjected to the arbitrary exactions of changing local political agents in nowise responsible to the taxpayer for the character of their work, or the enormity of their fiscal exactions. Such was the theory of regal taxation which induced magna charta at the hands of the then taxpayers of England, and such the basic theory of irresponsible foreign acquisition which produced our present form of national and state government, as the result of the arbitrary exactions of a distant and irresponsible domination.

These fundamentl principles are supported by our adjudications in *Board of Chosen Freeholders* v. *Stevenson,* 46 *N. J. L.* 173; *Freeholders* v. *Clark,* 65 *Id.* 276; *Foley* v. *Hoboken,* 61 *Id.* 480; *Oram* v. *New Brunswick,* 64 *Id.* 19, and by the general trend of all authorities, state and federal, which I have perused, as well as by the thoughtful consideration of accurate text-writers upon the subject. *Cooley Const. L.* 562.

In the last case cited Mr. Justice Magie declared "legislative acts affecting salaries which must be raised by taxation in municipalities do regulate internal affairs." The same learned authority in *Passaic v. Stevenson,* stated "the law in question which fixes amounts to be paid to prosecutors by particular counties which must be raised by taxation, is obnoxious to the prohibition of the constitution against private, local or special laws regulating the internal affairs of counties." In that case it is to be observed that the act *sub*

*judice* actually fixed the fees in question, while in this act irresponsible agents are cast upon the communities, and their salaries fixed by the *carte blanche* of a legislative agent. In the same case Mr. Justice Van Syckel says: "Those who control the county finances are charged with the duty of raising the necessary funds to pay such salaries, and upon such laws depend the extent to which the county shall be burdened by taxation. In no respect can the internal affairs of a county be more materially regulated. Laws relating to the mode of paying public officers by the counties, and to the amount of their compensation, regulate their internal affairs equally, whether such officers are engaged in administering justice or in the performance of other functions within the county."

Mr. Justice Garrison, in closing the opinion in *Foley* v. *Hoboken, supra,* intimates that such an exaction might well be considered as opposed to the fourteenth amendment of the federal constitution, citing *Gulf, &c., Co.* v. *Ellis,* 165 *U. S.* 150.

"An act," says the learned justice, in *Budd* v. *Hancock,* 66 *N. J. L.* 133, 135, "is special in a constitutional sense, when by force of an inherent limitation it arbitrarily separates some persons, places or things from others upon which, except for such limitation, it would operate." But *cui bono?* The sentiment pervading the cases is uniform and consistent, and upon this question the Rubicon long ago was crossed.

It is said that the legislative discretion which guided this act to successful passage must control, and we cannot gainsay. But there are judicial limits even to that, for while legislative discretion may be justified in any instance of legislative supervision, it cannot be justified in arbitrary legislative taxation applicable only to two segregations of the state, to the exclusion of the rest of the state upon a matter concededly of state jurisdiction. Nor can it be justified, as is claimed, upon the theory of the existence of a heterogeneous population, which in these days of rapid transportation neither loses its spots nor changes its character, whether viewed from the banks of the Hudson and Passaic, from the rolling billows of the Atlantic, or the placid waters of the Delaware.

I am advised that Mr. Justice Campbell and Judges Gardner, Van Buskirk and Clark concur in these views.

*For affirmance* — The Chancellor, Chief Justice, Trenchard, Parker, Lloyd, White, JJ. 6.

*For reversal*—Minturn, Campbell, Gardner, Van Buskirk, Clark, JJ. 5.