NEWARK SUPERIOR OFFICERS ASSOCIATION, A FRATERNAL ORGANIZATION INCORPORATED UNDER THE LAWS OF THE STATE OF NEW JERSEY AND WILLIAM GERAGHTY, THOMAS HENRY, THOMAS MARTIN, THOMAS CRITCHLEY, WILLIAM KODMAN, IRVING MOORE, ARNOLD EVANS, MARTIN REICHENBECKER, CHRISTIAN VOLZ, GEORGE HAMMER AND KENNETH MELCHOIR, PLAINTIFFS-RESPONDENTS, v. THE CITY OF NEWARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, KENNETH GIBSON, INDIVIDUALLY AND IN HIS CAPACITY AS MAYOR OF THE CITY OF NEWARK, HUBERT WILLIAMS, INDIVIDUALLY AND IN HIS CAPACITY AS POLICE DIRECTOR OF THE CITY OF NEWARK AND THE MUNICIPAL COUNCIL OF THE CITY OF NEWARK, DEFENDANTS-APPELLANTS, AND STATE OF NEW JERSEY, DEPARTMENT OF CIVIL SERVICE; HOWARD WOODSON, INDIVIDUALLY AND IN HIS CAPACITY AS CHAIRMAN OF THE CIVIL SERVICE COMMISSION OF THE STATE OF NEW JERSEY; AND JOSEPH M. RYAN, INDIVIDUALLY AND IN HIS CAPACITY AS ACTING CHIEF EXAMINER AND SECRETARY OF THE DEPARTMENT OF CIVIL SERVICE, DEFENDANTS.

Argued October 10, 1984—Decided January 14, 1985.

Rosalind L. Bressler, Assistant Corporation Counsel, argued the cause for appellants (John J. Teare, Corporation Counsel, attorney).

Donald B. Ross, Jr. argued the cause for respondents (Whipple, Ross & Hirsh, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

On August 6, 1979, L.1979, c. 163, N.J.S.A. 40:69A–60.7, became effective, allowing the mayors of cities of the first class with a "Mayor-Council Plan C" form of government under the Optional Municipal Charter Law, N.J.S.A. 40:69A–1 to 40:69A–210, to appoint their police chiefs. The issue here is whether N.J.S.A. 40:69A–60.7 is special legislation enacted in violation of N.J. Const. (1947), Art. IV, § VII, ¶ 9(13).

Both the trial court and the Appellate Division held that the law was unconstitutional because it was special legislation. The City of Newark appealed to this Court as of right pursuant to Rule 2:2–1(a)1.

I

Newark and Jersey City are the only cities in New Jersey of the first class (i.e., municipalities with a population in excess of 150,000) and both have adopted the "Mayor-Council Plan C" form of government. Accordingly, the act is applicable only to those two cities.

Newark has adopted Title 11 of the Revised Statutes, Civil Services, *N.J.S.A.* 11:1-1 to 28-3. Pursuant to that Title, the office of police chief was a classified civil service position that was filled in accordance with civil service procedures. However, in 1976 when Newark's police chief retired, Newark resisted appointing the chief through civil service because it wanted the position to become unclassified. For several years, no permanent police chief was appointed and the position was filled with interim appointees.

The Newark Superior Officers Association, an organization of deputy police chiefs of Newark and a plaintiff in this case, urged the Department of Civil Service to schedule a promotional examination for the position of police chief. In response to the requests of the Newark Superior Officers Association, Joseph H. Ryan, Acting Chief Examiner and Secretary of the Department of Civil Service, in a June 7, 1979 letter to the president of the Association, stated, in part:

This entire matter has been handled by the Department of Civil Service with a consideration of the unique demands for such a position. The City of Newark, being the largest city in the State of New Jersey, had asked for special treatment relative to the highest level position in the uniform police department. The judgment that this was a valid request was made on the basis of a very considered analysis of the situation.... The Department feels it acted within the authority granted to it by law in attempting to address not only the concept of merit fitness, but also to recognize the needs and requirements of the most populous city of the State.

In January 1978 at the request of the City, Senator Lipman of Essex County introduced legislation that provided that in first class cities operating under the "Mayor-Council Plan C" of the Optional Municipal Charter Law, the mayor may appoint a police director or a director of public safety, and a police chief. Such officers would be appointed without competitive examination, and would serve in the unclassified service of the civil service during the term of the mayor who appointed them. S. 687 (1978). In the "Mayor-Council Plan C" form of government, there was an unclassified police director over a classified police chief.

The State Assembly Municipal Government Committee prepared a statement accompanying the Act on June 21, 1979, which read as follows:

The Senate committee statement adequately expresses the provisions of this bill.

The bill applies to Newark and Jersey City; it comes at the request of Newark. In that city, the police director carries out long term administrative and planning policies; the police chief is responsible for the day to day implementation of those policies. The director and the chief must work closely together. The police director, in the unclassified civil service, must be responsive to the mayor and council. The police chief, on the other hand, in the classified service with tenure, may be unresponsive to the administration. By placing the office of police chief in the unclassified service, cooperation between the chief and the city administration will be assured.

The committee reports this bill with the understanding that legislation to be received by the Assembly, will deal with the problem of the relationship of the police chief to elected officials in more general terms. Jersey City has voiced no objections to this bill.

Subsequently, the bill was amended to omit the references to police director and director of public safety from the bill and to require that prior to his appointment the police chief had to have served as a superior police officer and possess at least five years administrative and supervisory police experience. The bill became effective on August 6, 1979 L.1979, c. 163, N.J.S.A. 40:69A–60.7.[1]

---

[1]N.J.S.A. 40:69A–60.7 provides:

a. Notwithstanding the provisions of any other law to the contrary, the governing body of any city of the first class, which has adopted or shall hereafter adopt the form of government designated as "Mayor-Council Plan C" provided for in Article 5 of the Act to which this Act is a supplement, may provide, by ordinance, that the Mayor shall appoint a police chief, who shall have served as a superior police officer and possess at least five years administrative and supervisory police experience, who shall serve during the term of office of the Mayor appointing him, and until the appointment and qualification of his successor, and who shall serve in the unclassified service of the civil service.

b. The Mayor of any first class city adopting the provisions of this supplementary act may in his discretion remove any person appointed pursuant to the provisions of this act, after notice and an opportunity to be heard. Prior to removing such person the Mayor shall first file written notice of his intention to do so with the council, and such removal shall

Newark adopted an ordinance pursuant to the act and proceeded to appoint a chief of police. Jersey City has never adopted such an ordinance.

A week after Newark adopted the ordinance plaintiffs brought this action in the Chancery Division, which action was subsequently transferred to the Law Division. Plaintiffs named as defendants the City of Newark, the Municipal Council of the City of Newark and two City officials, and the State of New Jersey and two state officials. Plaintiffs in their complaint charged that the law deprived its members of salary and fringe benefits; that the law was special legislation in violation of *N.J. Const.* (1947), Art. IV, § VII, ¶ 9; that the law violated their prevailing collective bargaining agreement by failing to provide for a promotional examination, and that it impaired their contract with the city contrary to *N.J. Const.* (1947), Art. IV, § VII, ¶ 3. Plaintiffs sought compensatory and punitive damages, an order directing that the civil service examination be given, and a permanent injunction against the city from appointing the police chief without an examination.

Both plaintiffs and defendants moved for summary judgment. In support of its motion, the City produced an affidavit from the Director of the Police Department of Newark, defendant Hubert Williams. In his affidavit, Director Williams stated that he has overall responsibility for the delivery of police services within the City. He stated that he established the policy and issued directives to ensure efficient use of personnel and property of the department. In addition, he said he performs community relations functions requiring the utmost sensitivity to the needs, fears and problems of the City's population. As the Police Director of the largest city in the state, with a population of 329,248 persons of diverse ethnic, racial and social backgrounds, he asserted that he deals on a "regular

become effective on the twentieth day after the filing of such notice unless the council shall prior thereto have adopted a resolution disapproving such removal by at least a ⅔ vote of the membership of the council.

basis with the conflicts and tensions typical of large urban areas." He pointed to the riots of 1967, 1968 and 1974 as a testament to the volatile nature of the community. Because of the complexity of his responsibilities Williams stated that he must rely heavily on the assistance of the police chief in performing his duties. Williams therefore asserted:

5. It is imperative that the person in the position of Police Chief hold the Director's trust and confidence, that he be able to act with sensitivity to community problems and tensions; that he exercised good judgment in decision making and in assisting formulation of policy, all of which qualifications are not measurable by the application of Civil Service standards.

6. In the belief that removing the position of Police Chief from the classified service would improve the operation of the Police Department and the delivery of police services and would ensure a greater degree of accountability from the top echelon of the Department in carrying out the policy and directives of the City Administration, I requested that the Mayor propose legislation providing for the removal of the position of Police Chief from the classified service.

The trial court denied the motions of all parties for summary judgment on the constitutionality of the statute and dismissed, without prejudice, the issues concerning alleged violations of civil service laws and the collective bargaining agreement on the grounds that they were moot.

As a result of a pre-trial conference the attorneys had with the trial court, the court advised them that it would review the papers submitted in support of their motions for summary judgment, and if it found there were no need for additional testimony, it would decide the issue of the constitutionality of N.J.S.A. 40:69A–60.7 on the stipulations entered that day. The stipulations were as follows:

The first stipulation deals with the population and numbers of uniformed police personnel in the seven largest municipalities, and those seven largest municipalities in the State of New Jersey in ranking order are as follows:

Newark, 329,248 population, police personnel of 1200.

Jersey City, 223,532 population, 853 uniformed police personnel.

Paterson, 137,970 population, 377 police uniformed personnel.

Elizabeth, 106,2011 [sic], 311 uniformed police personnel.

Trenton, 92,124 population, and 331 uniformed police personnel.

Woodbridge, 90,074 population, and 170 uniformed police personnel.

Camden, 84,910 population, 315 uniformed police personnel.

The second stipulation is that the County of Essex, which has its own police force, has a population of 850,451 with 114 uniformed police personnel. The next two cities, while not among the largest in the municipalities, are adjacent municipalities to the City of Newark and counsel felt that it was relevant and that is the City of East Orange with a population of 77,025 and 275 uniformed police personnel. The Town of Irvington, 61,493 population and 139 police personnel.

The third stipulation is that all New Jersey Municipalities in which Title XI, that is simple [sic] service is in effect have the position of police chief in the classified service except the City of Newark. Jersey City may but has not exercised its right under the challenged Act to take the position of police chief in the unclassified service.

The last stipulation is that all police chiefs in the classified service report to and are subordinate to an elected or appointed official or officials who are in the unclassified service.

The trial court held *N.J.S.A.* 40:69A–60.7 to be unconstitutional special legislation in violation of Article IV, § 7, ¶ 9(13) of the New Jersey Constitution. After the trial court decision but before an appeal to the Appellate Division was filed, *N.J.S.A.* 40:69A–60.7 was amended by P.L.1981, c. 465, § 43, effective January 9, 1982, to limit the application of the law to "any city of the first class which, prior to the effective date of this amendatory and supplementary act has adopted the form of government designated as Mayor-Council Plan C." This grandfather clause operates to exclude from the statute all cities except Newark and Jersey City.

The Appellate Division affirmed the judgment of the trial court. Both courts held that there was no rational basis "for thinking that the size of the municipality and its form of government somehow impact on the relationship between the police chief and his unclassified superior in a way that requires the police chief in certain municipalities, but not in others, also to be in the unclassified service." *Newark Superior Officers Ass'n v. Newark,* 187 *N.J.Super.* 390, 402 (1982). We disagree and reverse the judgment of the Appellate Division.

II

Article 4, Section 7, Par. 9(13) of the New Jersey Constitution provides:

The Legislature shall not pass any private, special or local laws ... (13) Regulating the internal affairs of municipalities formed for local government and counties except as otherwise in this Constitution provided.

The Constitution permits special laws under certain conditions and restrictions. Art. IV, § VII, ¶ 7; Art. IV, § VII, ¶ 8; Art. IV, § VII, ¶ 10. However, the parties agree that none of these conditions or restrictions is satisfied here.

■ The principles applicable to determining whether a statute is unconstitutional as "special legislation" are well established. First, it is well recognized that the courts do not act as a super-legislature. *Burton v. Sills*, 53 *N.J.* 86, 95 (1968). A statute is presumed to be constitutional and will not be declared void unless it is clearly repugnant to the Constitution. *Paul Kimball Hosp. v. Brick Township Hosp.*, 86 *N.J.* 429, 446–47 (1981); *Brunetti v. New Milford*, 68 *N.J.* 576, 599 (1975); *Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381, 388 (1959).

As Justice Schreiber stated in *Kimball, supra*, 86 *N.J.* at 446–47:

Thus the Legislature has wide discretion in determining the perimeters of a classification, *Harvey v. Essex Cty. Bd. of Freeholders*, 30 *N.J.* [381] at 390, distinction may be made with substantially less than mathematical exactitude, *Lane Distributors, Inc. v. Tilton*, 7 *N.J.* 349, 358–359 (1951), and an adequate factual basis for the legislative judgment is presumed to exist, *Burton v. Sills*, 53 *N.J.* 86, 95 (1968), app. dism. 394 *U.S.* 812, 89 *S.Ct.* 1486, 22 *L.Ed.*2d 748 (1969).

As Justice Cardozo stated in *Williams v. Baltimore*, 289 *U.S.* 36, 53 *S.Ct.* 431, 77 *L.Ed.* 1015 (1932),

The problem in last analysis is one of legislative policy, with a wide margin of discretion conceded to the law makers. Only in cases of plain abuse will there be revision by the courts. 289 *U.S.* at 46, 53 *S.Ct.* at 434, 77 *L.Ed.* at 1024.

■ The second principle applicable to determining whether a statute is unconstitutional special legislation is that the burden is on the party challenging the constitutionality of the statute to demonstrate clearly that it violates a constitutional provision. *Piscataway Township Bd. of Educ. v. Caffiero*, 86 *N.J.* 308, 318 (1981); *Jamouneau v. Horner*, 16 *N.J.* 500, 515 (1954); *In*

■■■■■■■■■■■■

*re Freygang,* 46 *N.J.Super.* 14 (App.Div.), aff'd, 25 *N.J.* 357 (1957).

■■■■ The third principle is that in deciding whether an act is special or general legislation, the determining factor is what is excluded and not what is included. In *Budd v. Hancock,* 66 *N.J.L.* 133 (Sup.Ct.1901), the court stated that if no one is excluded who should be included, the law is general. A general law is one that affects equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class themselves. The analysis used to determine whether any appropriate person is excluded to which the law, but for its limitations, would apply is similar to the analysis used to determine whether a person is afforded equal protection under the U.S. Constitution. These principles have been restated numerous times by this Court, most recently in *Kimball Hosp. v. Brick Township Hosp., supra,* 86 *N.J.* at 446.

■■ In *Vreeland v. Byrne,* 72 *N.J.* 292 (1977), we established a three part test to determine whether a statute passes as general legislation. "The test, of course, is whether the classification is reasonable, not arbitrary, and can be said to rest upon some rational basis justifying the distinction." *Id.* at 299. The three part test is as follows: first, we consider the purpose and object of the legislation; second, we apply it to the factual situation to determine whether any one thing is excluded that should be included; third, we determine whether, as so applied, the resulting classification can be said to rest upon any rational or reasonable basis relevant tò the purpose and object of the act. *Id.* at 300–01.

### III

Bearing in mind the three general principles outlined above, we now apply the *Vreeland* test to the statute presented here prior to its amendment in 1981.

As indicated above, *N.J.S.A.* 40:69A–60.7 provides that mayors of cities of the first class operating under the "Mayor-Council Plan C" form of government may appoint police chiefs to serve in the unclassified service of the civil service. The purpose of the Act is to provide for a police chief's greater cooperation with and accountability to the administration of cities of the first class.

Next, we determine whether any municipality is excluded that should be included. The Act is applicable only to Newark and Jersey City, the only first class cities in New Jersey with populations, respectively, of 329,248 and 223,532. In addition to having the largest populations in New Jersey, Newark and Jersey City also have the largest police forces. Newark has a police force of 1,200; Jersey City has a force of 853, and the next largest city, Paterson, a police force of 377. Newark's police force is larger than the combined police forces of the next four largest cities in New Jersey: Paterson, Elizabeth, Trenton and Woodbridge.

Although the Act is applicable only to Newark and Jersey City, no other similarly-situated municipality is excluded. There is no other city in this state that meets the population requirement of the act.

The final inquiry is whether the Act clearly rests on a rational basis justifying the classification. Although it has been suggested that the Legislature did not properly review this legislation, the legislative history of the statute indicates that it was carefully considered, rather than accepted without question as an accommodation to the City of Newark. The original bill as submitted was twice amended prior to adoption, first to omit the references to the police director and director of public safety from the bill, as these positions are subject to *N.J.S.A.* 40:69A–43, and second, to limit the discretion of the mayor of first class cities in appointing a police chief to persons who have served as police officers and possess at least five years administrative and supervisory police experience. *See* Part I *supra.*

Both .of the amendments as well as the statements of the Senate and Assembly committees support a finding that due consideration was indeed given to the purpose and provisions of the statute.

A classification based on population does not automatically render a law unconstitutional special legislation. Statutes relating to city government classified by population are generally upheld. 2 *C. Sands, Sutherland Statutory Construction* § 40.09 at 171 (4th ed. 1972).

> The classification of cities in statutes relating to municipal government is generally supported on the theory that the complexity of a city increases directly in proportion to the increase in size of the city, and statutes that meet the needs of the larger cities would be too great a burden for the smaller cities. [*Id.* at 187.]

Moreover, if the classification is otherwise valid, it is not rendered invalid by the fact that it applies to only one city in the state. *Kimball, supra,* 86 *N.J.* at 448.

The nexus between accountability and population has frequently been recognized by the Legislature: For example, *N.J.S.A.* 40:69A–43 provides for the appointment of department heads in certain cities of the first class for a term co-extensive with that of the mayor appointing them to ensure greater cooperation between the top officials and the city administrator in large cities. *See also N.J.S.A.* 40:69A–60.3 (providing for the appointment of an assistant business administrator in municipalities having a population of more than 300,000 with the "Mayor-Council Plan C" form of government); *N.J.S.A.* 40:69A–60.1 (providing for the appointment of deputy mayors and other assistants to the mayors of municipalities having populations of more than 80,000 with the "Mayor-Council Plan C" form of government); *N.J.S.A.* 40:69A–60.5 (providing for the appointment of aides for councilmen in municipalities having a population of more than 200,000 with the "Mayor-Council Plan C" form of government).

New Jersey courts also recognize that population can form a valid basis for legislative classification. *See McDonald v.*

*Board of Freeholders,* 99 *N.J.L.* 393 (E & A 1923); *Attorney General v. McKelvey,* 78 *N.J.L.* 621 (E & A 1909); *Williams v. Smith,* 94 *N.J.Super.* 341 (App.Div.1967), aff'd, 51 *N.J.* 161 (1968); *Koons v. Atlantic City,* 134 *N.J.L.* 329 (Sup.Ct.1946).

In *Attorney General v. McKalvey, supra,* 78 *N.J.L.* 621, the Court held that an act creating a board of public works in cities having a population between 100,000 and 200,000 inhabitants was not special legislation.

> An examination of the numerous decisions of our courts since the adoption of the amendment of 1875, prohibiting private, local or special laws regulating the internal affairs of towns and counties, demonstrates that a law would be general although it embraces only a class of cities formed on the basis of their population according to the discretion of the Legislature, provided the law deals merely with the structure and machinery of government, and provided the class does not appear to have been formed illusively. The cases go further, however, and demonstrate that *a classification will not be deemed illusive merely because the effect is to make the legislation applicable to cities of a certain size only. Where the act relates to the structure of machinery of government, something more must appear in order that the court may hold the classification illusive, than the mere fact that only certain cities come within the class.*

In *McDonald v. Board of Freeholders, supra,* 99 *N.J.L.* 393, the Court held that a statute providing for the office of superintendent of elections in counties of the first class was not special legislation. The Court held that the large population and crowded election districts, existing at that time only in Essex and Hudson Counties, formed a rational basis for the position only in counties of the first class.

In *Williams v. Smith, supra,* 94 *N.J.Super.* 341, the court found that tenure provisions for building inspectors in nonseashore cities with populations in excess of 12,000 did not create an unreasonable classification that violated the constitutional bar on special legislation. The court noted that classification of cities by population for purposes of municipal legislation dates back to 1882, citing *L.* 1882, *c.* 46, now *N.J.S.A.* 40:167–1 and 2. *Id.* at 344.

> The 1911 Legislature probably had in mind that in the more populous municipalities, where experience and presumed integrity were required in the important work of dealing with varied and ofttimes important and substantial construc-

tion, the officer charged with the responsibility of supervising and approving such work should have protection in his office through a grant of tenure. For it was in the larger urban centers—at least then—where most building construction was taking place. It was in precisely these localities that expertise was required and political insulation demanded. [*Id.* at 347.]

In *Koons v. Atlantic City, supra,* 134 *N.J.L.* 329 while the court recognized that population may be a valid classification, it found no rational basis for legislation applicable only to Atlantic City that authorized a retail sales tax to provide for the use and recreation of the public in any city with a population in excess of 50,000 bordering on the Atlantic Ocean. The court found there were numerous seashore cities, facing the same problems as those facing Atlantic City, that should not have been excluded from the statute.

## IV

Ultimately, the generality or speciality of a statute becomes a question of reasonableness. There is no general rule to distinguish a reasonable from an unreasonable classification, the question being a practical one varying with the facts in each case. As stated previously, where the question of reasonableness is fairly debatable, courts will uphold the classification. The burden of showing that the classification is not reasonable is upon the party attacking the statute. If we can conceive of any reason to justify the classification, the statute will be upheld. As the Supreme Court stated in *Williams v. Mayor & City Council of Baltimore,* 289 *U.S.* 36, 46, 53 *S.Ct.* 431, 434, 77 *L.Ed.* 1015, 1024 (1933),

Time with its tides brings new conditions which must be cared for by new laws. Sometimes the new conditions affect the members of a class. If so, the correcting statute must apply to all alike. Sometimes the new conditions affect one only or a few. If so, the correcting statute may be as narrow as the mischief. The Constitution does not prohibit special laws inflexibly and always. It permits them when there are special evils with which existing general laws are incompetent to cope. The special public purpose will sustain the special form....

The problem in last analysis is one of legislative policy, with a wide margin of discretion conceded to the lawmakers. Only in cases of plain abuse will there be revision by the courts.... If the evil to be corrected can be seen to be

merely fanciful, the injustice or the wrong illusory, the courts may intervene and strike the special statute down .... If special circumstances have developed, and circumstances of such a nature as to call for a new rule, the special act will stand.

Our analysis discloses that the populations of Newark and Jersey City, as well as the size of their police forces, bear a reasonable relation to the subject matter of *N.J.S.A.* 40:69A–60.7. The reason for the statute is that the nature of the office of police chief in this state's largest municipalities requires that the chief be a person whom the police director can rely on and who will be accountable to the administration. The Director of the Police Department in Newark, Hubert Williams, has testified that because of the size of that City's population, the size of its police force, and the history of tension and social problems that continue to exist today, it is essential that he be able to rely heavily on the assistance of a police chief. In addition, as police director of a large police force, unlike police directors of smaller municipalities, he must share many of the burdens of his office with the police chief because they are too great for one person to handle. Therefore, it is essential that the police chief be someone who has the confidence of the police director. The sheer volume of law enforcement problems facing the police director in more populous cities may well create circumstances that do not even exist in smaller municipalities. Other cities may have diverse populations and volatile situations but the combination of these factors in Newark and Jersey City, together with the size of their populations and law enforcement staffs, alter the duties that a police director and a police chief in a large city are called upon to perform.

As stated in M. Kelly, *Police Chief Selection: A Handbook for Local Government* (1975),

The police department carries out one of the most basic functions of local government, and its employees are among the most publicly visible. The leader of the police department, therefore, does much to affect how citizens view the entire municipal government. [*Id.* at 1.]

*Policing is perhaps the most important function of local government.* It is a 24-hour function that is highly visible. The powers of police to arrest citizens and to affect the moral complexion of the community, as well as the duties of

police to maintain public order and protect constitutional liberties, are the most fundamental public functions. They require special care and good judgment. A poorly managed police department will not only reflect on the administration currently in office, but will also affect public attitudes toward government in general. [*Id.* at 5; emphasis contained in original.]

The days when political authorities could rely on finding a professional who would "take care" of policing for them have long since passed. The pressures of budgeting, personnel, and social change require police and local government management to work more closely than ever to understand each other's perspective. This mutual recognition and partnership takes time, effort, and no small amount of patience and insight. The selection of the chief is the critical beginning in this effort. [*Id.* at 52.]

Hence, the quality of leadership is probably more important to the performance of police than any other municipal service. Moreover in a large municipality the police chief helps shape policy as well as carry it out. Therefore, the selection of a person who possesses the qualities necessary for effective police leadership in a large municipality would serve to insure a greater degree of accountability from the top echelon of the police department in carrying out the policy directives of the city administration.

It is clear from the foregoing analysis that a rational basis exists for limiting the scope of the statute to the police chiefs of municipalities with populations as large as those of Newark and Jersey City. The soundness of the removal of the position of police chief of the state's largest urban centers from the classified service has been acknowledged by the Department of Civil Service, which noted the "unique demands for such a position," and the validity of Newark's request for the legislation. Moreover, the objective of the statute is fully consistent with the objectives of the Civil Service Act, *N.J.S.A.* 11:1–1 to 11:28–3, which exempts high level policy makers from the classified service. *See Mastrobattista v. Essex County Park Commission,* 46 *N.J.* 138 (1965); *see also N.J.S.A.* 11:4–4 and *N.J.S.A.* 11:22–2.

Finally, even if one were to argue that the Legislature should have examined the problem that the statute was intended to cure in the context of its possible application to other

municipalities, this Court has heretofore recognized that legislative bodies may undertake the progressive resolution of problems, dealing first with those aspects that are most pressing. *See Piscataway Township Bd. of Educ., supra,* 86 *N.J.* 308 where this Court held:

> The fact that the Legislature did not at the same time address the problem of deterring delinquent behavior by nonpublic school children or the problem of compensating school districts for all acts of vandalism does not deprive the statute of its rational basis. A state may undertake resolution of problems one step at a time, addressing itself to the part of the problem that seems most acute. *Williamson v. Lee Optical of Oklahoma,* 348 *U.S.* 483, 489, 75 *S.Ct.* 461, 465, 99 *L.Ed.* 563 (1955) [*Id.* at 324.]

We hold that the statutory classification is reasonable and that the statute is not unconstitutional. In view of the objectives sought to be attained, we hold that the present legislative classification by population is based upon a rational difference in situation or condition found to exist between the municipalities of the state. The classification is not arbitrary and is based upon material and substantial distinctions reasonably related to the subject matter of the legislation.

V

Effective January 9, 1982, *N.J.S.A.* 40:69A–60.7 was amended by *L.*1981, *c.* 465, § 43 to limit its application to "any city of the first class, which, prior to the effective date of this amendatory and supplementary act, has adopted the form of government designated as Mayor-Council Plan C." This grandfather clause operates to exclude any other cities from coming under the aegis of the statute in the future.

We held in *Kimball v. Brick Township Hosp., supra,* 86 *N.J.* at 441:

> Grandfather clauses reflect the legislative policy that the new regulatory process shall be effective prospectively. Since that legislative policy may have a conceivably rational basis, grandfather exclusions are not invidious per se and violative of equal protection. See *Affiliated Distillers Brands Corp. v. Sills,* 56 *N.J.* 251 (1970), mod. on other grounds 60 *N.J.* 324 (1972). The question from an equal protection viewpoint is whether there is a justifiable basis for the discrimination. A classification will not be set aside if any state of

facts reasonably may be conceived to justify it. *McGowan v. Maryland,* 366 *U.S.* 420, 81 *S.Ct.* 1101, 6 *L.Ed.*2d 393 (1961). If there is a conceivable legitimate purpose for the grandfathering, the legislative action will be upheld.

Applying this standard, we find it difficult to conceive a rational basis for excluding other municipalities that may in the future become first class cities operating under the "Mayor-Council Plan C" form of government. *See Fagan v. Payne,* 75 *N.J.L.* 851 (E & A 1907); *Seymour v. Orange,* 74 *N.J.L.* 549 (E & A 1906). The reasoning that supports the constitutionality of the statute prior to this amendment, *see* Parts II, III, IV *supra,* would apply as well to municipalities that in the future become first class cities operating under the "Mayor-Council Plan C" form of government. Accordingly, we find the amendment to the statute to constitute special legislation in violation of the New Jersey Constitution.

■ Nevertheless, we hold that the grandfather clause may be severed from the statute and the remaining valid parts sustained. In *Affiliated Distillers Brands Corp. v. Sills,* 56 *N.J.* 251 (1970), we analyzed the issue of when a clause or amendment to a statute may be severed without destroying the validity of the remaining statute.

Severability is a question of legislative intent. *Angermeier v. Borough of Sea Girt,* 27 *N.J.* 298, 311 (1958). The governing principle is whether it can be fairly concluded that the Legislature designed the statute to stand or fall as a unitary whole. In reaching this conclusion, we must determine whether the objectionable feature can be excised without substantial impairment of the principle object of the statute. *N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners,* 48 *N.J.* 581, 593 (1967). An entire statute will not be invalidated when one clause is found to be unconstitutional unless that clause is so intimately interconnected with the whole that it can be reasonably said that the Legislature would not have enacted the statute without the offending clause. [*Id.* at 265.]

We reiterated this principle in *Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412 (1977):

It is a question of interpretation and of legislative intent whether the particular provision is so interwoven with the invalid clauses as that it cannot stand alone.... Courts will enforce severability where the invalid portion is independent and the remaining portion forms a complete act within itself. [*Id.* at 422–23.]

We find that without the grandfather clause the statute is complete within itself. The severance of the clause from the statute will not harm the objective or purpose of the statute.

Furthermore, the statute is part of the Faulkner Act, which specifically provides that "if any clause, sentence, paragraph, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof." *N.J.S.A.* 69A–209; *see also Fagan v. Payne, supra,* 75 *N.J.L.* 851; *Affiliated Brands, supra,* 56 *N.J.* 251.

We conclude that while the amendment containing the grandfather clause is unconstitutional, the remainder of the statute is valid and constitutional.

## VI

*N.J. Const.* (1947), Art. VII, § 1, ¶ 2 provides

2. Appointments and promotions in the civil service of the State, and of such political subdivisions as may be provided by law, shall be made according to merit and fitness to be ascertained, *as far as practicable,* by examination, which, as far as practicable, shall be competitive; except that preference in appointments by reason of active service in any branch of the military or naval forces of the United States in time of war may be provided by law. [Emphasis supplied.]

Plaintiff alleges that *N.J.S.A.* 40:69A–60.7 is unconstitutional under the above provision of the New Jersey Constitution. We find little merit in this position.

*N.J. Const.*1947, Art. VII, § 1, ¶ 2 does not require that merit and fitness be determined by competitive examination in every case, but only "as far as practicable." In *Falcey v. Civil Service Commission,* 16 *N.J.* 117 (1954), we discussed the intent of this provision.

The framers of the Constitution recognized that although competitive examination would be the general rule in Civil Service appointments and promotions, there would be situations where such examination would not be practicable, and they made explicit provision therefor. In this respect they followed precedents in other states, notably New York where provision had originally been made in its constitution of 1894, that appointments and promotions in the civil service shall be made according to merit and fitness to be ascertained "so far as

practicable" by examinations which, "so far as practicable," shall be competitive. [*Id.* at 122–23.]

*See also Terry v. Mercer Cty. Freeholder Bd.*, 86 *N.J.* 141, 150–51 (1981).

Further, the Legislature has long recognized that merit and fitness cannot always be determined by competitive examinations. *See, e.g., N.J.S.A.* 11:4–4 and *N.J.S.A.* 11:22–2s, (providing, respectively, that certain positions in state and municipal service shall not be in the classified service, and permitting the Civil Service Commission to determine which other offices and positions shall be in the unclassified service); *N.J.S.A.* 40:69A–43 (providing for the appointment of department directors); *N.J.S.A.* 40:69A–60.1, 60.3, 60.5 (providing for appointment of various assistants to the mayor of municipalities with a "Mayor-Council Plan C" form of government).

The Legislature has determined that in Newark and Jersey City examinations may not be the best way to choose police chiefs.

Such exams are usually drawn from standard police administration texts or current department practice. They contain easily graded, multiple-choice questions, rarely rewarding conceptual or problem-solving capability. [*Police Chief Selection, supra,* at 41.]

Moreover, the challenged legislation requires, as minimum qualifications for the position of police chief, that the appointee "shall have served as a superior police officer and possess at least 5 years administrative and supervisory police experience." *N.J.S.A.* 40:69A–60.7. This requirement insures that appointees possess specific, measurable qualifications relating to fitness in addition to those qualities required for the position that cannot be measured and qualified by the examination process.

## VII

In conclusion, *N.J.S.A.* 40:69A–60.7 represents a reasonable and rational determination by the Legislature that the municipalities encompassed within its purview are sufficiently distinguishable to form a class by themselves. The classification is

not illusory; rather, it recognizes the need of this state's largest municipalities, Newark and Jersey City, for greater responsiveness and accountability from the chief of the police department. In view of the totality of circumstances, including the significantly higher populations and larger police forces of Newark and Jersey City, the community tensions exemplified by Newark and that City's history of urban problems, it is clear that there is a rational basis for the classification. In these municipalities a police chief helps shape policy. If the police chief is not sensitive to the administration's plans, he can, in a city like Newark, become ineffective in averting disturbances which may have widespread repercussions. Hence, it is certainly reasonable to conclude that law enforcement in cities like Newark and Jersey City encompass greater difficulties and challenges than law enforcement in other municipalities. Size itself is a material factor that renders administration more complex, accentuating the need for greater harmony between the chief and the administration. In this context, the statutory classification is reasonable and the statute is not unconstitutional.

In addition, we hold that *L.*1981, *c.* 465, § 43, the amendment to *N.J.S.A.* 40:69A–60.7, lacks a rational basis and thereby constitutes special legislation in violation of the New Jersey Constitution. However, this amendment may be severed from the statute and the remaining valid parts sustained.

The judgment of the Appellate Division is reversed.

O'HERN, J., concurring.

I concur in the Court's opinion with the exception of Part V. I disagree that the Court is required to hold *L.*1981, *c.* 465 to be unconstitutional. I do not read the majority's judgment of the constitutionality of the classification to be based solely on population. The opinion recognizes that it is the combination of "diverse populations and volatile situations" reflected in a "history of tension of social problems" that goes into the legislative

judgment. *Ante* at p. 228. Not every municipality that grows in population may exhibit the same characteristics. It will be time enough to judge whether such a municipality must be included in the class when we have the case. There is, thus far, no such case before us. The Legislature should have the chance to reflect upon automatic membership in the class before we pass judgment.

O'HERN, J., concurring in the result.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Affirmed*—None.