712 A.2d 1148

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. ONE 1990 HONDA ACCORD, NEW JERSEY REGISTRATION NO. HRB20D, VIN NO. 1HGCB7659LA063293 AND FOUR HUNDRED TWENTY DOLLARS, DEFENDANT–RESPONDENT.

Argued March 16, 1998—Decided July 15, 1998.

*Richard W. Berg,* Deputy Attorney General, argued the cause for appellant (*Peter Verniero,* Attorney General of New Jersey, attorney).

*Elizabeth Macron* argued the cause for respondent.

The opinion of the Court was delivered by

POLLOCK, J.

At issue is whether the owner of property that is not *prima facie* contraband has a right to a jury trial in a forfeiture action under *N.J.S.A.* 2C:64–3f.

The Monmouth County Prosecutor brought a civil *in rem* action under *N.J.S.A.* 2C:64–1 to –9 ("Forfeiture Act"), seeking forfeiture of a 1990 Honda Accord owned by Lois McDermott. McDermott demanded a jury trial and counterclaimed for a declaration that *N.J.S.A.* 2C:64–3f, which provides for the non-jury disposition of a forfeiture action, is unconstitutional.

In a summary proceeding under *N.J.S.A.* 2C:64–3f, the Law Division determined that McDermott was not entitled to a jury trial and forfeited her Honda to the State. With one judge

dissenting, the Appellate Division reversed and remanded for a new trial. 302 *N.J.Super.* 225, 695 *A.*2d 303 (App.Div.1997). The Attorney General filed a notice of appeal as of right. *R.* 2:2-1(a)(2). We affirm.

I.

At the forfeiture hearing, the State established that McDermott's son, Jackie, used the Honda almost daily. On one occasion, Jackie used the car both to transport heroin and to assault and elude a police officer. On two other occasions, he sold heroin from the Honda to a detective posing as a drug buyer. Before the forfeiture hearing, Jackie pled guilty to the various offenses that led to the seizure of McDermott's Honda.

McDermott, a 65-year-old widow in poor health, testified that she never consented to her son's illegal use of the Honda, that she did all that she could to prevent him from using it, and, in effect, that she was an innocent owner. She gave him neither a key nor permission to use the Honda. McDermott was aware, however, that Jackie had used the Honda on five or six occasions without her permission. She also knew of his extensive criminal record and acknowledged that his prior criminal activities had led to the forfeiture of another car.

The trial court found that Jackie had continuing possession of or access to the Honda. It also found a direct causal relationship between his use of the Honda and his criminal offenses. Consequently, the court ordered forfeiture of the Honda to the State.

The Appellate Division reversed, holding that McDermott was entitled to a jury trial in a forfeiture action and that the statutory proceeding for summary disposition was unconstitutional. 302 *N.J.Super.* at 227, 695 *A.*2d 303. In reaching that result, the court relied on an historical analysis of the right to trial by jury in England and the American colonies. *Id.* at 230-34, 695 *A.*2d 303. The dissenting judge, however, was unpersuaded that in New Jersey a defendant in a forfeiture action historically was entitled to a jury trial. *Id.* at 235, 695 *A.*2d 303 (Rodriquez, J., dissenting).

## II.

■ Statutes are presumed to be constitutional. *General Motors Corp. v. City of Linden*, 150 *N.J.* 522, 532, 696 *A.*2d 683 (1997); *Newark Superior Officers Ass'n v. City of Newark*, 98 *N.J.* 212, 223, 486 *A.*2d 305 (1985). Anyone challenging the constitutionality of a statute bears the burden of establishing its unconstitutionality. *Newark Superior Officers Ass'n*, *supra*, 98 *N.J.* at 222, 486 *A.*2d 305. Consequently, McDermott bears the burden of proving that *N.J.S.A.* 2C:64–3f is unconstitutional.

The Forfeiture Act defines two classes of property subject to forfeiture: (1) *prima facie* contraband, such as heroin, *N.J.S.A.* 2C:64–1(1); and (2) "innocent" property, such as an automobile, "which has been or is intended to be, utilized in furtherance of an unlawful activity," *N.J.S.A.* 2C:64–1(2). Different procedures apply to the forfeiture of the two kinds of property. With *prima facie* contraband, the State may retain the property until the conclusion of the criminal proceeding, after which the property shall be forfeited, "subject to the rights of owners and others holding interests pursuant to Section 2C:64–5." *N.J.S.A.* 2C:64–2. The forfeiture of innocent property, however, is subject to a summary hearing conducted in accordance with *N.J.S.A.* 2C:64–3f. McDermott asserts that by not providing for a right to trial by jury, *N.J.S.A.* 2C:64–3f is unconstitutional.

■ Article 1, paragraph 9 of the New Jersey Constitution of 1947 provides that "the right of trial by jury shall remain inviolate." *N.J. Const.* art. 1, ¶ 9. This provision guarantees the right to jury trial to the extent that that right existed at common law when the New Jersey Constitution was adopted. *State v. Anderson*, 127 *N.J.* 191, 207, 603 *A.*2d 928 (1992); *Weinisch v. Sawyer*, 123 *N.J.* 333, 343, 587 *A.*2d 615 (1991).

■ Traditionally, the right to a jury trial attaches in legal, but not equitable actions. *Weinisch*, *supra*, 123 *N.J.* at 343, 587 *A.*2d 615. Hence, the right to trial by jury depends on whether the cause of action is primarily legal or equitable. *Ibid.; Steiner v.*

*Stein,* 2 *N.J.* 367, 379, 66 *A.*2d 719 (1949). In making that determination, the critical considerations are the nature of the requested relief and the historical basis of the cause of action. *Ibid.* (citing *Shaner v. Horizon Bancorp,* 116 *N.J.* 433, 447–55, 561 *A.*2d 1130 (1989); *In re LiVolsi,* 85 *N.J.* 576, 587–90, 428 *A.*2d 1268 (1981); *Asbestos Fibres, Inc. v. Martin Labs., Inc.,* 12 *N.J.* 233, 239–40, 96 *A.*2d 395 (1953)).

This Court has never decided whether the historical focus of the right to jury trial is the 1947 Constitution, *In re LiVolsi, supra,* 85 *N.J.* at 587, 428 *A.*2d 1268, the 1844 Constitution, *Steiner, supra,* 2 *N.J.* at 378–79, 66 *A.*2d 719, or the 1776 Constitution, *Montclair v. Stanoyevich,* 6 *N.J.* 479, 485, 79 *A.*2d 288 (1951). As a practical matter, acceptance of one constitution or another probably does not affect the recognition of the right. Bruce D. Greenberg & Gary K. Wolinetz, *The Right to a Civil Jury Trial in New Jersey,* 47 *Rutgers L.Rev.* 1461, 1502 n. 35 (1995). Here, the parties agree that the 1776 Constitution is determinative.

## III.

In 1776, forfeiture existed in England both at common law and by statute. At common law, an inanimate object described as "deodand" could be forfeited for causing a person's death. Also at common law, property could be forfeited on the owner's conviction of treason or a felony. English law provided for statutory forfeitures of objects used in the violation of customs and revenue laws. *Austin v. United States,* 509 *U.S.* 602, 611–13, 113 *S.Ct.* 2801, 2806–07, 125 *L. Ed.*2d 488 (1993).

In New Jersey, forfeiture never existed at common law and remains a disfavored remedy. *State v. Seven Thousand Dollars,* 136 *N.J.* 223, 238, 642 *A.*2d 967 (1994); *State v. 1979 Pontiac Trans Am,* 98 *N.J.* 474, 480–81, 487 *A.*2d 722 (1985); *Farley v. $168,400.97,* 55 *N.J.* 31, 36–37, 259 *A.*2d 201 (1969); *State v. One Ford Van,* 154 *N.J.Super.* 326, 331, 381 *A.*2d 387 (App.Div.1977), *certif. denied,* 77 *N.J.* 474, 391 *A.*2d 489 (1978). Its existence depends on the enactment of a statute. The State argues that

because forfeiture is a creature of statute, McDermott has no common-law right to a jury trial.

Although forfeiture depends on a statute for its existence, it remains subject to common-law principles. When analyzing the right to trial by jury, the term "common law" refers to those principles of English law that evolved in the common-law courts such as the Court of the Exchequer, as opposed to those applied in the Admiralty, Chancery, or Ecclesiastical Courts. *People v. One 1941 Chevrolet Coupe*, 37 *Cal.*2d 283, 231 *P.*2d 832, 836 (1951); *In re Forfeiture of 1978 Chevrolet Van*, 493 *So.*2d 433, 435 (Fla.1986); *Commonwealth v. One 1984 Z–28 Camaro Coupe*, 530 *Pa.* 523, 610 *A.*2d 36, 39 (1992); *see also* William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 *Wm & Mary L.Rev.* 393 (1968) (" 'Common law' refers to that body of governing principles, mainly substantive, expounded by the common-law courts of England in deciding cases before them."). Hence, the fact that common-law forfeiture did not become part of New Jersey common law does not predetermine whether statutory forfeiture was subject to trial by jury in the colonial common-law courts. The subject forfeiture, which involves the seizure on land of innocent property, is the type of case in which the owner would have been entitled to a jury trial in the common-law courts of colonial New Jersey.

## IV.

### A.

Long before the American Revolution, the English Court of Exchequer and the Admiralty Court exercised jurisdiction over the forfeiture of objects used in violation of law. *C.J. Hendry Co. v. Moore*, 318 *U.S.* 133, 137, 63 *S.Ct.* 499, 501, 87 *L. Ed.* 663 (1943). Admiralty cases proceeded without a jury. In contrast, cases in the Court of Exchequer proceeded before a jury. *See United States v. One 1976 Mercedes Benz 280S*, 618 *F.*2d 453, 464 (7th Cir.1980) ("The distinction between the practice in courts of

Admiralty, which heard forfeiture actions without a jury, and the common law courts of Exchequer, in which forfeiture actions were heard with a jury, is well-known."); *One 1941 Chevrolet, supra,* 231 *P.*2d at 839 ("There are reports of many cases in the Court of Exchequer in which articles used in violation of law were forfeited to the Crown pursuant to statute, in all of which the cause was tried by jury."); *One 1984 Z–28 Camaro Coupe, supra,* 610 *A.*2d at 41 ("[I]n England, forfeiture actions in the Courts of Exchequer were tried before a jury...."). To illustrate, the Court of Exchequer had jurisdiction to hear cases involving the forfeiture of articles seized on land. *C.J. Hendry, supra,* 318 *U.S.* at 137, 63 *S.Ct.* at 501. It also exercised concurrent jurisdiction with the Admiralty courts over cases involving forfeiture of vessels for violations on navigable waters. *Ibid.*

The American colonies did not establish a Court of Exchequer. Instead, the common-law courts absorbed that court's jurisdiction. *Id.* at 139, 63 *S.Ct.* at 502–03. Thus, in the American colonies, colonial common-law courts generally heard actions involving forfeitures on land. *See Austin, supra,* 509 *U.S.* at 613, 113 *S.Ct.* at 2807 ("But '[l]ong before the adoption of the Constitution the common law courts in the Colonies ... were exercising jurisdiction *in rem* in the enforcement of [English and local] forfeiture statutes'") (quoting *Calero–Toledo v. Pearson Yacht Leasing Co.,* 416 *U.S.* 663, 683, 94 *S.Ct.* 2080, 2091, 40 *L. Ed.*2d 452 (1974)); *C.J. Hendry, supra,* 318 *U.S.* at 143, 63 *S.Ct.* at 505 ("[T]here is ample support for the conclusion that in the seaboard states forfeiture proceedings in rem ... were an established procedure of the common law courts before the Revolution."); *One 1976 Mercedes Benz, supra,* 618 *F.*2d at 466 ("The conclusion appears inescapable that both English and American practice prior to 1791 definitely recognized jury trial of *in rem* actions at common law as the established mode of determining the propriety of statutory forfeitures on land for breach of statutory duties."); *One 1941 Chevrolet, supra,* 231 *P.*2d at 842 ("The common-law courts in the Colonies and in the states during the period of Confederation exercised jurisdiction in rem in the enforcement of forfeiture

statutes. In general the actions ... were tried by jury....");
*One 1984 Z–28 Camaro Coupe, supra,* 610 *A.*2d at 41 ("[I]n the
United States, forfeiture actions were heard before juries in cases
where Courts of Exchequer would have had jurisdiction."). If the
forfeiture took place on navigable waters, either the admiralty or
common-law courts had jurisdiction. *C.J. Hendry, supra,* 318 *U.S.*
at 139, 63 *S.Ct.* at 503; Franklyn C. Setaro, *The Formative Era of
American Admiralty Law,* 5 *N.Y.L.F.* 9, 26 (1959). Like English
common-law courts, and unlike admiralty courts, colonial common-
law courts provided for trial by jury. *C.J. Hendry, supra,* 318
*U.S.* at 139–40, 63 *S.Ct.* at 503.

## B.

In 1776, when New Jersey declared its independence, it none-
theless adopted the common law of England. *N.J. Const. of 1776,*
¶ XXII. The 1776 Constitution provided:

> That the common law of England, as well as so much of the statute law, *as have
> been heretofore practiced in this colony,* shall still remain in force, until they shall
> be altered by a future law of the legislature; such parts only excepted, as are
> repugnant to the rights and privileges contained in this charter; and *that the
> inestimable right of trial by jury shall remain confirmed, as a part of the law of
> this colony, without repeal, forever.*
>
> [*N.J. Const. of 1776,* ¶ XXII (emphasis added).]

After the Revolution, the English common law as of 1776, except
as changed by statute or the State Constitution, became part of
New Jersey law. *State v. Smith,* 85 *N.J.* 193, 199, 426 *A.*2d 38
(1981); *Collopy v. Newark Eye & Ear Infirmary,* 27 *N.J.* 29, 43,
141 *A.*2d 276 (1958).

Other states embraced English common law with varying de-
grees of warmth. *Seminole Tribe of Florida v. Florida,* 517 *U.S.*
44, 132–43, 116 *S.Ct.* 1114, 1161–65, 134 *L. Ed.*2d 252 (1996)
(Souter, J., dissenting); *see also Van Ness v. Pacard,* 27 *U.S.* (2
*Pet.*) 137, 144, 7 *L. Ed.* 374 (1829) ("The common law of England is
not to be taken in all respects to be that of America. Our
ancestors ... adopted only that portion which was applicable to
their situation."). New Jersey, however, followed English prece-

dents "to a high degree." Stoebuck, *supra*, at 403; *see also* Anton–Hermann Chroust, *The Rise of the Legal Profession in America*, 1, 193–94 (1975) (noting that no English colony more fully accepted and followed English common law than did New Jersey). Before the Revolution, for example, New Jersey practice followed that in England concerning forfeitures pursuant to fish and game laws, police power regulations, and the Navigation Acts. Generally, if English common law provided Englishmen with a right to a trial by jury, New Jersey common law provided a comparable right to the people of this State.

## C.

The highest courts in the majority of other states have struck down as unconstitutional statutes similar to *N.J.S.A.* 2C:64–3f. In general, these courts reason that their state constitutions preserve the common-law right to trial by jury in *in rem* forfeiture actions. *One 1941 Chevrolet Coupe, supra*, 231 *P*.2d at 844; *In re Forfeiture of 1978 Chevrolet Van*, 493 *So*.2d 433 (Fla.1986); *Idaho Dep't of Law Enforcement v. Free*, 126 *Idaho* 422, 885 *P*.2d 381 (1994); *People ex rel O'Malley v. 6323 North LaCrosse Ave.*, 158 *Ill*.2d 453, 199 *Ill.Dec.* 690, 634 *N.E*.2d 743 (1994); *Commonwealth v. One 1972 Chevrolet Van*, 385 *Mass.* 198, 431 *N.E*.2d 209 (1982); *Vergari v. Marcus*, 26 *N.Y.*2d 764, 309 *N.Y.S*.2d 204, 257 *N.E*.2d 652 (1970); *State v. 1920 Studebaker Touring Car*, 120 *Or.* 254, 251 *P.* 701 (1926); *One 1984 Z–28 Camaro Coupe, supra*, 610 *A*.2d at 41; *Medlock v. 1985 Ford F–150 Pick Up*, 308 *S.C.* 68, 417 *S.E*.2d 85 (1992). Like New Jersey, those states' constitutions guarantee the right to trial by jury as it existed at common law when their constitutions were adopted. *See, e.g., One 1941 Chevrolet Coupe, supra*, 231 *P*.2d at 835 (construing California's constitutional provision that "[t]he right to trial by jury shall be secure to all, and remain inviolate" to include right to trial as it existed at common law when constitution was adopted in 1849); *1978 Chevrolet Van, supra*, 493 *So*.2d at 433 (construing Florida's constitutional provision that "[t]he right to trial by jury shall be secure to all,

and remain inviolate" to include right to jury trial as it existed at common law when constitution became effective in 1845); *Cade, supra,* 885 *P.*2d at 384 (construing Idaho's constitutional provision that "[t]he right to trial by jury shall remain inviolate" to include right to trial as it existed at common law when Idaho constitution was adopted in 1889). *But see People v. Allen,* 767 *P.*2d 798 (Colo.Ct.App.1988); *Swails v. State,* 263 *Ga.* 276, 431 *S.E.*2d 101(Ga.), *cert. denied,* 510 *U.S.* 1011, 114 *S.Ct.* 602, 126 *L. Ed.*2d 567 (1993); *State Conservation Dep't v. Brown,* 335 *Mich.* 343, 55 *N.W.*2d 859 (1952); *In re Forfeiture of $1,159,420,* 194 *Mich.App.* 134, 486 *N.W.*2d 326 (1992), *appeal denied,* 442 *Mich.* 905, 503 *N.W.*2d 439, and *cert. denied,* 510 *U.S.* 867, 114 *S.Ct.* 189, 126 *L. Ed.*2d 147 (1993); *State v. Morris,* 103 *N.C.App.* 246, 405 *S.E.*2d 351 (1991). To conclude, the decisions from other jurisdictions suggest that in common-law forfeiture actions the trier of fact was the American jury.

## V.

### A.

Although the mists of time cloud the perception of the historical right to trial by jury, the contours of that right emerge from the shape of colonial statutes and courts. "Upon this point, a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 *U.S.* 345, 349, 41 *S.Ct.* 506, 507, 65 *L. Ed.* 963 (1921).

History establishes that New Jersey colonists placed a high premium on the right to trial by jury. Early legislation establishing courts in New Jersey provided for trial by jury in all courts, except those hearing small claims. Between 1675 and 1702, New Jersey was divided into two provinces, East and West Jersey, each of which established a court system. Richard S. Field, *The Provincial Courts of New Jersey* 23–31 (1849). In 1702, the two provinces surrendered to Queen Anne, who appointed Lord Cornbury as the Governor of the united Royal Province of New Jersey. Stephen B. Presser, *An Introduction to the Legal History of*

*Colonial New Jersey,* 7 *Rut.-Cam. L.J.* 262, 270 (1976). Two years later, pursuant to the terms of the Queen's commission, Lord Cornbury promulgated an "Ordinance" establishing courts throughout the entire Province of New Jersey. Field, *supra,* at 42.

Lord Cornbury's Ordinance established courts like those that existed in England. When defining the jurisdiction and practice of the New Jersey courts, the Ordinance expressly referred to the courts of England. Edward Q. Keasbey, *The Courts of New Jersey: Some Account of Their Origin and Jurisdiction* 84 (1903) ("Courts of New Jersey"). Hence, the Ordinance authorized the Supreme Court of Judicature to hear all pleas, "civil, criminal, and mixt, as fully and amply to all intends and purposes whatsoever as the courts of Queen's Bench, Common Pleas and Exchequer within her Majesties Kingdom of England have or ought to have." *Id.* at 85. Additionally, the Ordinance gave to the civil side of the County Court or Court of Sessions the English name of "Court of Common Pleas." *Ibid.*

Justices of the peace, who sat without a jury, could hear small-claims matters—civil cases involving less than forty shillings. 1 Edward Quinton Keasbey, *The Courts and Lawyers of New Jersey: 1661–1912* 172, 174 (1912); Field, *supra,* at 43. The Ordinance also established the Court of Common Pleas, which had its origin in the provincial courts of East and West Jersey, as a county court with jurisdiction to determine all causes triable at common law. Edward V. McConnell, "A Brief History of the New Jersey Courts," 7 *N.J. Digest* 349–50 (1959); Field, *supra,* at 43; Keasbey, *supra,* at 172, 175.

Lord Cornbury's Ordinance maintained the courts of General Sessions, which the General Assembly founded in 1675, and the proprietors of East and West New Jersey continued. Keasbey, *supra,* at 175. In both East and West Jersey, these courts exercised civil and criminal jurisdiction, subject to trial by jury. Keasbey, *supra,* at 120, 144–45, 157; Field, *supra,* at 24. The Ordinance also provided for a Supreme Court of Judicature and

invested it with the general common-law jurisdiction of the higher courts of England. Keasbey, *supra*, at 172, 176.

Finally, Lord Cornbury's Ordinance provided that:

[N]o Person's Right of Property shall be, by any of the aforesaid Courts Determined, except where matters of Fact are either acknowledged by the Parties, or Judgment confessed, or passeth by the Defendant's fault for want of Plea or Answer, unless the Fact be found by verdict of twelve men of that neighborhood, as it ought to be done by law.

[Keasbey, *supra*, at 177.]

Before the Ordinance, West Jersey established a Court of Oyer and Terminer for criminal matters in 1693. Field, *supra*, at 26; Keasbey, *supra*, at 154–55, 157. One authority declares "[n]o one was to be deprived or condemned of life, liberty or property without trial by a jury of twelve men of the neighborhood." Keasbey, *supra*, at 56, 143–44. Lord Cornbury's Ordinance does not mention the Court of Oyer and Terminer. Provincial governors, however, issued commissions for that court to the judges of the Supreme Court. Keasbey, *supra*, at 155.

The courts established by Lord Cornbury remained substantially unchanged until the adoption of the first New Jersey Constitution in 1776. Keasbey, *supra*, at 161, 181; Field, *supra*, at 45. Hence, in 1776, colonial New Jersey's common-law courts included the Supreme Court, the Courts of Common Pleas, the Courts of General Sessions, and the Courts of Oyer and Terminer, each of which provided for trials by jury. *See generally* "An Act relative to juries and verdicts," (passed Nov. 10, 1797), William Paterson, *New Jersey Laws: 1703–1799* 259 (1800) (discussing use of juries in Supreme Court, Court of General Sessions, and Court of Common Pleas); *G. v. C.*, 172 *N.J.Super.* 123, 130, 410 *A.*2d 1199 (Law Div.1978) (noting that neither Lord Cornbury's Ordinance nor subsequent ordinances removed right to trial by jury in county courts established under the proprietors), *aff'd*, 172 *N.J.Super.* 360, 412 *A.*2d 128 (App.Div.1979); Supreme Court Docket, 58, 1770–1772 (describing jury trials in Supreme Court); Michael R. Lazerwitz, *The New Jersey Provincial Supreme Court: Common Law Adjudication During the 1770s* (1980) (unpublished History

thesis, Princeton University) (same); Courts of New Jersey, *supra,* at 103 (noting that "trials of criminal and civil cases, by a jury of the county in which the offense was alleged to have been committed, or the cause of action arose, were quite frequent" in Supreme Court); Keasbey, *supra,* at 120, 144–45 (discussing right to jury trial in East and West Jersey's county courts—predecessors to Courts of Common Pleas and General Sessions). Judges heard cases without juries, however, in the justices' court, usually described as the Court for the Trial of Small Causes, with jurisdiction over matters involving less than forty shillings.

## B.

The history of litigation under the English Navigation Acts sheds further light on the right to trial by jury in colonial New Jersey. Those Acts, among other things, required the use of English crews on vessels carrying goods from Europe to the Colonies. Violations of the Acts resulted in the forfeiture of the goods as well as the ship that transported them. *Austin, supra,* 509 *U.S.* at 612, 113 *S.Ct.* at 2807. The Navigation Acts commonly provided that a forfeiture action might be brought "in any court of record." *C.J. Hendry, supra,* 318 *U.S.* at 139 n. 3, 63 *S.Ct.* at 502 n. 3 (citing 12 *Car. II,* c. 18, §§ 1, 3, 4, 6, and 18 (1660) (providing for forfeiture proceeding "in any Court of Record"); 7 & 8 *Wm. III,* c. 22, § 2 (1696) (providing that forfeitures of ships and goods might be enforced "in any of his Majesty's courts of record at Westminster, or in any court in his Majesty's plantations, where such offence shall be committed")).

Colonial common-law courts regularly heard actions under the Navigation Acts. *Id.* at 140, 63 *S.Ct.* at 503. Colonies such as Virginia, Maryland, Massachusetts, Pennsylvania, New Hampshire, Connecticut, and Maine provided jury trials at common law for forfeitures under the Navigation Acts. *Id.* at 140–45 nn. 4–6, 63 *S.Ct.* at 503–05 nn. 4–6.

American juries, however, were loath to enforce the Navigation Acts. *Id.* at 141, 63 *S.Ct.* at 503–04. Parliament reacted by

seeking to establish colonial Admiralty courts, which would hear cases without juries. *Ibid.* Vice-admiralty courts did not appear in the colonies until the closing years of the seventeenth century. Setaro, *supra*, at 22. In 1738, the parliamentary vice-admiralty commission to Lewis Morris, then governor of New Jersey, extended to New York, New Jersey, and Connecticut. *Id.* at 24. New Jersey continued to share an Admiralty judge with those two colonies until the Revolution. When comparing the court system of New York and New Jersey, Alexander Hamilton pointed out that New Jersey, unlike New York, had not established Admiralty or Probate courts. According to Hamilton, in New Jersey, Admiralty and Probate matters proceeded in the courts of common law. *The Federalist No. 83* (Alexander Hamilton). Significantly, he added, "of course the jury trial is more extensive in New Jersey than in New York." *Ibid.*

*The Journal of the Courts of Common Right and Chancery of East New Jersey: 1683–1702* (Preston W. Edsall ed.1937) contains the record of several condemnation proceedings under the Navigation Acts, including the 1688 condemnation of *The Unity* in the Middlesex Court of Common Pleas, where cases proceeded before juries. *Id.* at 136–37, 63 S.Ct. at 501–02. Even more persuasive is the 1685 case of *The Dolphin,* which involved a trial by jury for a violation of the Navigation Acts. The sloop Dolphin landed in Elizabethtown with a cargo of European goods. *Id.* at 135, 63 S.Ct. at 500–01. After the ship was loaded, the Surveyor General of Customs, William Dyre, arrived and discovered that only one of the crew was English. Dyre seized the ship for violating the Navigation Acts. The Dolphin's master, however, prevailed upon Governor Lawrie to sign a pass allowing the Dolphin to set sail. Dyre pursued the Dolphin, brought her back, and filed an information. *Ibid.* Because the Court of Common Right had adjourned, Governor Lawrie created a special commission to adjudicate the matter. *Ibid.* A jury heard the case and entered a verdict for the Dolphin's owner. *Id.* at 136, 63 S.Ct. at 501. The court taxed costs of "£4.3.0," which Dyre refused to pay. Adding injury to

insult, the court seized Dyre's horse for £3 and imprisoned him for the balance. *Ibid.*

Another Navigation Acts case was the "Proceedings against William Hackett, Captain of the Sloop Indeavor of Salsbery in the County of Norfolk in New England," at a special court held in Elizabethtown by commission from the New Jersey Governor on May 16, 1671. Keasbey, *supra,* at 84; Presser, *supra,* at 291 (citing 1 *N.J. Archives* 64 (1880)). The Governor sought to forfeit the Indeavor and its cargo because the ship had been loaded and unloaded at Woodbridge, contrary to the Navigation Acts. *Ibid.* After retiring three times, the first jury asked to be discharged because "the matter committed to them is of too great weight." Presser, *supra,* at 291. A second jury, empaneled the next day, however, found the defendant guilty and entered a judgment of forfeiture. Keasbey, *supra,* at 85. The significance of the forfeiture actions in *The Dolphin* and *The Indeavor* is not that the juries reached different verdicts, but that both actions proceeded before juries.

## C.

The colony of New Jersey, moreover, employed forfeiture as a means of enforcing provincial laws concerning customs duties and the exportation or importation of commodities. Like the Navigation Acts, these early customs statutes were triable "in any Court of Record in this Province by Bill, Plaint or Information." *See, e.g.,* "An Act for preventing the Waste of Timber, Pine and Cedar Trees and Poles within this Province of New Jersey, and to lay a Duty Upon all Pipe & Hogshead Staves exported out of the same to any of the Neighboring Colonies," (passed March 11, 1713/14), IV *Laws of the Royal Colony of New Jersey: 1760–1769* 131–33 (providing for forfeiture of any pipe or hogshead staves on which export duty not paid "in any Court of Record with this Province"); "An Act to lay a Duty on Wheat, Wheat–Meal, Staves and Heading of all sorts, and Bolts whereof Staves or Heading may or can be made," (passed Aug. 23, 1725), II *Laws of the Royal Colony*

*of New Jersey: 1703–1745* 331–32 (providing for forfeiture of all wheat, wheat-meal, staves, heading, and bolts for failure to pay duty "in any Court of Record in this Province"); "An Act for Preserving of Timber in the Eastern Division of the Colony of New Jersey, and all Sorts of Trees in the Bounds of the Pattent or Charter of the Township of Bergen that lies in Common," (passed Dec. 2, 1743), II *Laws of the Royal Colony of New Jersey: 1703– 1745* at 575–78 (providing for forfeiture of timber to be exported for failure to pay duty in "any Court of Record in this Province"); "An Act to encourage the direct Importation of Rum from the West–Indies, and such Wines as may lawfully be imported from the Places of their Growth, Product and Manufacture, into the Eastern Division of New Jersey," (passed Dec. 2, 1743), II *Laws of the Royal Colony of New Jersey: 1703–1745* at 579 (providing for forfeiture of wine and rum imported without duty paid in "any Court of Record within this Colony"). Forfeiture actions under these laws, like those under the Navigation Acts, would have proceeded in the common-law courts. As the State concedes, such actions, if heard in the common-law courts, would have been tried to juries.

### D.

While a colony, New Jersey enacted a series of forfeiture statutes to punish violations of fish and gaming statutes. *See, e.g.,* "An Act for Preserving Oysters in the Province of New–Jersey," (passed March 27, 1719), Samuel Nevill, *Acts of the General Assembly of the Province of New Jersey* 86 (1752) (providing for forfeiture of any canoe, flat, scow, boat, or other vessel used by non-residents of New Jersey for raking oysters before "two of His Majesty's Justices of Peace . . . of the County where such Seizure shall be made" who "shall give Judgment against, and Condemn the same"); "An Act to Regulate the Fishery within that part of the Eastern Division of this Colony, from the Mouth of the Raritan River northward," (passed May 10, 1768), Samuel Allinson, *Acts of the General Assembly of the Province of New Jersey*

309 (1776) (providing forty shilling fine to be recovered in action before justice of peace for fishing with nets in small spawning rivers and creeks; providing further for seizure and disposition of "contraband" nets in summary procedure before justice of peace); "An Act entitled An Act to prevent Killing of Deer out of Season and against Carrying of Guns and Hunting by Persons not Qualified," (passed 1722), Nevill, *supra*, at 100 (providing for fines under forty shillings upon conviction before justice of peace); "A Supplementary Act to the Act entitled An Act to prevent Killing of Deer out of Season and against Carrying of Guns and Hunting by Persons not Qualified," (passed 1752), *id.* at 445–53 (providing for forfeiture of steel deer traps in summary proceeding before justice of peace); "An Act to regulate the Size of Traps to be hereafter set in this Colony," (passed Dec. 5, 1760), IV *Laws of the Royal Colony of New Jersey: 1760–1769* 52–53 (providing for fines as well as forfeiture and destruction of heavy steel and iron traps before "any one Magistrate or Justice of Peace"); "An Act for the more effectual Preservation of Deer in this Colony," (passed Dec. 6, 1769), *id.* at 582–85 (providing for forfeiture and destruction of steel and iron traps weighing over five pounds in proceeding before magistrate or justice of peace); "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns," (passed Dec. 21, 1771), Paterson, *supra*, at 19–22 (providing that anyone who sets a trap larger than that commonly set for foxes and muskrats, shall suffer £5 fine, three month imprisonment, and forfeiture and destruction of trap in proceeding before magistrate or justice of peace "without any reference to the act for trial of small causes in this colony").

As the preceding statutes indicate, in colonial New Jersey, as in England, certain forfeiture and penalty proceedings to enforce police statutes and to punish minor criminal offenses, such as violations of the fish and game acts, proceeded before justices of the peace without juries. *See Greely v. City of Passaic,* 42 *N.J.L.* 429, 431 (E. & A. 1880) (noting that "[P]arliament conferred upon the [justice of the peace] certain judicial functions, as a means of enforcing the game acts" by "a summary proceeding, technical in

character, of a quasi-criminal nature, and totally unlike an action at law"); *State v. Lakewood Mkt. Co.*, 84 *N.J.L.* 512, 523, 88 *A.* 194 (Sup.Ct.1913) (holding that penalty action instituted pursuant to Fish and Game Procedure Act of 1897 did not include jury trial because "[i]t has been repeatedly held in this state that in a summary procedure for the collection of a penalty for violation of a police regulation, neither party is entitled to a trial by jury"); *Carter Bros. v. Camden Dist. Court*, 49 *N.J.L.* 600, 602, 10 *A.* 108 (Sup.Ct.1887) (holding that right to trial by jury did not attach in suit to recover penalty for violation of 1886 "Act to prevent deception in the sale of oleomargarine, butterine, or any imitation of dairy products" since violation was petty offense); *Shivers v. Newton*, 45 *N.J.L.* 469, 476 (Sup.Ct.1883) (holding no right to jury trial in action to recover penalty for violation of 1882 "Act to prevent the adulteration and to regulate the sale of milk"); *Howe v. Plainfield*, 37 *N.J.L.* 145, 148 (Sup.Ct.1874) (holding that jury trial not required before imposition of penalty for selling intoxicating liquors contrary to city ordinance, reasoning that "prior to 1776, the legality of convictions before magistrates for petty offenses and for violations of police regulations without trial by jury, was unquestioned"); *McGear v. Woodruff*, 33 *N.J.L.* 213, 216 (Sup.Ct.1868) (holding that, prior to 1776, convictions before magistrates for petty criminal offenses and violations of police regulations were of frequent occurrence, and were recognized as part of laws of England).

Only one post-Revolution case cited by the State involved a forfeiture, as opposed to a penalty. In *Haney v. Compton*, 36 *N.J.L.* 507, 523 (E. & A. 1873), the Court of Errors and Appeals considered a replevin action under a state statute that authorized civil *in rem* forfeitures of vessels used to gather oysters illegally in New Jersey waters. The statute provided for a forfeiture hearing before a special tribunal consisting of two justices of the peace. *Ibid.* The plaintiffs violated the statute by allowing a non-resident to use their vessel to harvest oysters. *Id.* at 521.

In denying plaintiffs a jury trial, the court relied on an earlier opinion, *McGear v. Woodruff, supra,* 33 *N.J.L.* 213, which involved a prosecution under a municipal ordinance that prohibited placing refuse in the street. Essential to *McGear*'s denial of the right to trial by jury was the petty nature of offense. The *McGear* court noted that under English law before 1776 magistrates sitting without juries heard cases involving petty offenses and violations of police regulations. *Id.* at 216. The New York courts were quick to perceive that when denying a jury trial in the forfeiture action, the *Haney* court incorrectly analogized such an action to a penalty action before a magistrate for violation of a municipal ordinance. In a case involving an oyster fishing statute almost identical to the one at issue in *Haney,* the New York Supreme Court, Appellate Division, sustained the right to a jury trial. The court reasoned that the *Haney* court wrongly applied *McGear*'s exception for petty offenses to an *in rem* forfeiture action. *Colon v. Lisk,* 13 *A.D.* 195, 43 *N.Y.S.* 364, 371–72 (App.Div.), *aff'd,* 153 *N.Y.* 188, 47 *N.E.* 302 (1897). To conclude, we are unpersuaded that the denial of jury trials in *Haney* and *McGear* compels a similar denial in the present case. Cases involving the forfeiture of innocent property generally resulted in a trial by jury. The disposition through summary proceedings of petty offenses and violations of police regulations of cases involving contraband is best viewed as an exception to the general rule. *One 1941 Chevrolet Coupe, supra,* 231 *P.*2d at 844.

## VI.

■ The absence of automobiles from colonial New Jersey does not mean that actions to forfeit them, unlike actions to forfeit other kinds of innocent property, such as ships, would not have been subject to trial by jury. New kinds of property should be treated like their earlier counterparts. *One 1941 Chevrolet Coupe, supra,* 231 *P.*2d at 844; *see also 1920 Studebaker, supra,* 251 *P.* at 703 ("There were also many petty offenses against statutes or municipal ordinances which were not triable by jury at the time the Constitution was adopted.... In all such cases the punish-

ment was trivial. . . . We find no case, and none has been cited, in which the common-law courts, prior to adoption of our State Constitution, through the exercise of summary powers have sanctioned or upheld the forfeiture of property which may be and ordinarily is used for lawful purposes."). Automobiles are no less innocent in modern society than sailing ships were in colonial times. New Jersey colonists insisted on jury trials for the forfeitures of ships and their contents. Automobile owners are entitled to the same protection today. The forfeiture of automobiles today, like that of sailing ships in earlier times, should be subject to the general rule requiring trial by jury.

■ Doubtless, the right to trial by jury will be an inconvenience to the State when it seeks to forfeit innocent property. Mere inconvenience, however, cannot justify the denial of a constitutional right. *One 1976 Mercedes, supra,* 618 *F.*2d at 468 (citations omitted). Other states have found that the recognition of the right to trial by jury in actions to forfeit innocent property does not pose a burden to law enforcement or to judicial administration. *Supra* at 381–82, 712 *A.*2d at 1151–52. Today, as in the past, the jury often stands as a shield between the individual and the State. "The right of trial by jury is an ever-present reminder of our belief in the importance of the individual." *Lyn–Anna Properties Ltd. v. Harborview Dev. Corp.,* 145 *N.J.* 313, 332, 678 *A.*2d 683 (1996).

We take no position on the issue whether McDermott is entitled to the return of her Honda. Our holding goes no further than to state that she is entitled to have that issue determined by a jury.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.