# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1210-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

F.S-T.,[1]

     Defendant-Appellant,

and

C.A.A-J.,

     Defendant.

_____

IN THE MATTER OF M.Y.S-A.,
a minor.

_____

Submitted November 6, 2025 – Decided November 21, 2025

---

[1] We use initials and pseudonyms to protect the confidentiality of these proceedings. R. 1:38-3(d)(12).

Before Judges Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FN-20-0061-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (John A. Albright, Assistant Deputy Public Defender, of counsel and on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; Michelle McBrian, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant F.S-T. (father) appeals from a Family Part judge's order finding he abused or neglected his biological daughter, M.Y.S-A. (Mia), born in 2012. We affirm.

Mia was born in Guatemala and lives there with her biological mother. Mia's father, who is a United States citizen, lives in Plainfield, New Jersey. In December 2023, Mia temporarily moved to the United States to live with her father so she could apply for a United States passport. Mia planned to stay with her father for a few weeks and then return to her mother in Guatemala after

obtaining a United States passport. Because Mia's stay was extended for several months rather than a few weeks as planned, her father enrolled Mia as a fifth grader in a local public school.

Also residing in her father's apartment, were her father's former partner (stepmother), stepmother's biological daughter, A.S. (Ann), and her father and stepmother's biological son (brother).

In February 2024, Mia asked Ann to be present so Mia would never be alone with her father. Because Mia was crying, Ann did not ask why Mia made this request. Thereafter, Ann drove Mia to and from school and her extracurricular activities. Additionally, Mia started sleeping in Ann's room.

A few days after Mia requested not to be left alone with her father, Mia told Ann about incidents when her father told Mia to remove her pants and viewed pornography with her. Ann urged Mia to tell someone at school about these occurrences.

Around the same time, Mia also told her swim instructor about the incidents with her father. An individual at the swimming facility then contacted the Division of Child Protection and Permanency (DCPP).

On February 20, 2024, Mia told her Spanish teacher her father inappropriately touched her. Mia also told the teacher she did not like her father

3

touching her and yelled at him to stop. Mia asked her teacher not to tell her father she reported the touching incidents.

Mia's teacher immediately reported Mia's disclosure to the school's social worker. Mia met with the social worker on February 20, 2024 and explained she did not feel safe at home because of her father's behavior. The social worker contacted the Plainfield Police Department to report the father's suspected abuse of Mia. The police transported Mia to a local Child Advocacy Center (CAC). The same day, the police arrested Mia's father.

At the CAC, Detectives Claudia Diaz and Kenneth Mirabella from the Union County Prosecutor's Office interviewed Mia. Detective Diaz spoke with Mia in Spanish during the recorded interview. Mia told the detectives about her father's abuse. Mia explained her father "trie[d] to touch [her] . . . like trying to abuse [her]." Mia was "ashamed" when describing the abuse to the detectives, felt "disgusted to talk about [her]self because of it," and "want[ed] to cry" thinking about it.

Mia told the detectives about one occasion when her father came into her room, grabbed her, and she scratched her face on a nail trying to get away. Mia explained she escaped by kicking her father.

A-1210-24

In another incident from late December 2023, Mia told the detectives that her father abused her after she showered. Mia reported her father grabbed her hands, climbed onto her feet so she could not move, and licked her vagina. Father's conduct on that occasion caused Mia to cry loud enough for the family's dog to bark. Upon hearing the dog bark, Mia said her father stopped his abuse. Mia explained she then dressed in pajamas and walked out of the house with the dog to "get away from" her father.

After Mia left the apartment, her stepmother arrived. According to Mia, her stepmother's arrival made her father "scared" and "kind of nervous" because he did not expect the stepmother to be home at that time.

Mia also told Detective Diaz that her father licked her vagina the day before their interview. According to Mia, no one was in the apartment at the time. Mia explained she was asleep in her room when her father entered. Mia said her father pulled down her pants and licked her vagina "about three times." Mia told the detective she kicked her father, pulled up her pants, and ran out of the house.

Mia described for Detective Diaz other instances of her father's abuse. One time, when Ann and her stepmother left the apartment, her father told her to "[h]urry up before they come, pull down your pants." Mia said something

5

similar happened the same morning as the interview. According to Mia, her father stated "'[p]lease let's do it. [Ann] is asleep, [and the brother, and stepmother] went to work.'" Mia understood her father wanted to have sex. When Detective Diaz asked if Mia understood the term "sex," Mia responded: "[T]hey used to say in the school in Guatemala where I studied, that when a woman and a man take their clothes off . . . [a]nd the man . . . puts his part inside the woman's part." Mia said her father did not have sex with her.

Mia also told the detectives that her father showed her pornography on his cellphone. Mia explained pornography was "when people have sex . . . [b]ut it is recorded." Mia recalled her father showing her pornography and saying he wanted her to "do this," which she understood as him wanting to have sex with her. While watching pornography, Mia claimed her father said, "[t]his girl is your age, she does it with her daddy and you don't want to do it. I buy you the things you want, and you never do me the favor."

Mia also reported to the detective she had her own room but slept in Ann's room so her father would not abuse her. When Mia began sleeping in Ann's room, Mia said her father "started getting furious, angry."

The same day as the detectives' interview, Mia underwent a sexual abuse examination at a local hospital. The examination revealed blood and male DNA

6

on Mia's underwear. Detective Mirabelli later testified the blood and DNA were not matched to any specific individual. Nor did the police confirm whether the DNA came from semen.

Detective Mirabelli interviewed Ann and Mia's stepmother. Ann reported she "noticed that [Mia's father] would call [her and stepmother] whenever they left the home to try to get a time when they would return," which never occurred before Mia lived with the family. Mia's father refused to be interviewed by Detective Mirabelli.

Detective Mirabelli obtained a search warrant for the apartment and confiscated the father's cell phone. The detective observed a nail in the molding around the door to Mia's room.

In March 2024, the DCPP arranged to return Mia to her mother in Guatemala. While at the airport, Mia told a DCPP worker about two additional incidents of abuse by her father when he visited in Guatemala. Mia said her father took her to a field to teach her to drive a car. After her father parked the car, he spoke to Mia about puberty and asked her to remove her pants to see if she had pubic hair. Despite her father's insistence, Mia did not remove her pants. During another incident in Guatemala, after Mia's mother left the house, her father took a shower. When her father got out of the shower, he asked Mia to

A-1210-24

bring him clothes. Mia's father exposed himself to her. The DCPP worker testified Mia was soft-spoken and embarrassed when discussing these incidents.

Between August and October 2024, the Family Part judge held fact-finding hearings on the DCPP's abuse or neglect allegations against Mia's father. During those hearings, the judge heard testimony from Detectives Diaz and Mirabelli, Mia's Spanish teacher, the DCPP worker who took Mia to the airport, and Ann. The judge found these witnesses to be credible. Because she returned to Guatemala, Mia did not testify. However, Mia's recorded interview with Detective Diaz was admitted in evidence

Based on Mia's recorded interview and the testimony of the trial witnesses, the judge found the DCPP established Mia's father abused or neglected Mia contrary to N.J.S.A. 9:6-8.21(c)(3).

On appeal, Mia's father argues Mia's out-of-court statements were not corroborated by independently admissible evidence as required under N.J.S.A. 9:6-8.46(a)(4). Additionally, Mia's father asserts the Family Part judge's abuse or neglect determination impermissibly relied on incompetent evidence never offered or admitted during the fact-finding hearing. Specifically, he claims the statements regarding pornography on his cellphone constituted impermissible

hearsay, the DNA evidence presented at trial was never matched to him, and the judge failed to identify the basis for Mia's precocious knowledge.

Our scope of review is limited. We "defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). We accord deference based on the Family Part's "special jurisdiction and expertise in family matters." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 392, 413 (1998)). We defer to a trial judge's credibility and factual determinations and will overturn those determinations only when the "findings 'went so wide of the mark that a mistake must have been made.'" N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, we review a trial judge's interpretation of the law de novo. N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 374 (2024) (citing N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017)).

Title Nine, N.J.S.A. 9:6-8.8 to 9:6-8.73, governs child abuse and neglect actions. N.J.S.A. 9:6-8.21(c)(3) defines an "[a]bused or neglected child" as "a

child less than [eighteen] years of age whose parent or guardian . . . commits or allows to be committed an act of sexual abuse against the child."  A finding of sexual abuse must be based on a "preponderance of the evidence."  N.J.S.A. 9:6-8.46(b).   Under N.J.A.C. 3A:10-7.4(a)(2), a finding of substantiated sexual abuse includes "[s]ubjecting a child to sexual activity or exposure to inappropriate sexual activity or materials."

Defendant contends there was no corroborating evidence supporting Mia's reported sexual abuse.   We review a judge's determination concerning corroborating evidence under N.J.S.A. 9:6-8.46(a)(4) de novo.  N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018) (reasoning such a finding "essentially involve[s] the application of legal principles and d[oes] not turn upon contested issues of witness credibility") (quoting N.B., 452 N.J. Super. at 521).  Under N.J.S.A. 9:6-8.46(a)(4), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." See also N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011) ("[A] child's hearsay statement may be admitted into evidence, but may not be the sole basis for a finding of abuse of neglect.").

"The most effective types of corroborative evidence may be eyewitness testimony, a confession, an admission or medical or scientific evidence." N.J. Div. of Youth & Fam. Servs. v. L.A., 357 N.J. Super. 155, 166 (App. Div. 2003). Corroborating evidence need not independently prove the abuse or neglect occurred. A.D., 455 N.J. Super. at 161. New Jersey courts have found:

> In most cases of child sexual abuse . . . there is no direct physical or testimonial evidence. The child victim is often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation. Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority. Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse.
>
> [N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002) (quoting State v. Swan, 790 P.2d 610, 615-16 (Wash. 1990)).]

The corroboration requirement may be satisfied by indirect evidence, such as "a child victim's precocious knowledge of sexual activity, a semen stain on a child's blanket, a child's nightmares and psychological evidence." N.J. Div. of Child Prot. & Permanency v. I.B., 441 N.J. Super. 585, 591 (App. Div. 2015) (quoting Z.P.R., 351 N.J. Super. at 436). In Z.P.R., we found "no doubt that

11

evidence of age-inappropriate sexual behavior could provide the necessary corroboration required by N.J.S.A. 9:6-8.46(a)(4)." 351 N.J. Super. at 436. Similarly, a child's "knowledge of sexual practices beyond her reasonably anticipated imagination" may corroborate the child's reported sexual abuse. Ibid. (quoting State v. D.R., 214 N.J. Super. 278, 298 (App. Div. 1986)).

Having reviewed the record, we are satisfied the judge properly found corroborating evidence to support Mia's hearsay statements regarding her father's abuse. The judge concluded the testimony of Detectives Diaz and Mirabelli, Mia's Spanish teacher, the DCPP's caseworker, and Ann, as well as the physical evidence from the apartment, provided corroborating evidence of abuse and neglect beyond Mia's out-of-court statements. The judge did not rely solely on Mia's hearsay statements as the basis for his finding abuse or neglect. See P.W.R., 205 N.J. at 33.

Specifically, the judge found Mia's "precocious knowledge" of sexual activity, described by way of the "idiosyncratic details contained in her statements" to the various witnesses sufficiently corroborated the abuse or neglect allegations. Additionally, the judge determined Mia's revealing to Ann she did not want to be left alone with her father, Ann then driving Mia to and from school and other activities, and Ann allowing Mia to sleep in her bedroom

A-1210-24

further corroborated the allegations. The judge found Ann's testimony describing her personal observation of Mia's behavioral changes also corroborated the abuse or neglect allegation.

The judge noted Mia gave Detective Diaz a detailed description of both the pornography her father forced her to watch and her father's performing of oral sex on her. Mia's description of these sexual activities was far too detailed to be imagined or age appropriate.

Moreover, the judge relied on Detective Mirabelli's testimony regarding the physical evidence supporting Mia's allegations. This included the detective stating he found a nail protruding from the molding in the door frame to Mia's room and Mia telling the Detective Diaz she suffered a facial scratch from a nail when she fled from her father's abuse. Detective Mirabelli also testified about the blood and male DNA evidence found on Mia's underwear from the hospital's sexual assault examination. The judge determined "all of this information, standing alone" constituted "sufficient indirect evidence to corroborate [Mia's] claim of abuse."

The judge concluded "each of the[] witnesses corroborated different parts of [Mia]'s entire story." The judge determined the testimony and physical evidence "collectively established" Mia's father abused or neglected her. The

A-1210-24

record contains ample evidence to corroborate Mia's extensive and detailed allegations regarding her father's sexual abuse. We agree with the judge's finding there was sufficient corroborating evidence in the record to support Mia's out-of-court hearsay statements regarding her father's abuse or neglect.

To the extent we have not addressed any of Mia's father's remaining arguments, they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division