**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0061-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DEEPA RAO,

    Defendant-Appellant.

_____

Argued November 7, 2024 – Decided January 9, 2025

Before Judges Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Municipal Appeal No. MA-23-11.

Gina A. Calogero argued the cause for appellant.

Christopher R. Lyons, Assistant Prosecutor, argued the cause for respondent (John P. McDonald, Somerset County Prosecutor, attorney; Christopher R. Lyons, on the brief).

PER CURIAM

Defendant Deepa Rao appeals from an August 21, 2023 Law Division order denying her municipal court appeal after de novo review. Both the municipal court and Law Division found defendant's dog, Koda, potentially dangerous under N.J.S.A. 4:19-23 and imposed the required mandatory penalties and safeguards to mitigate any future attacks, including ordering that Koda receive a tattoo to reflect his status. We affirm.

## I.

## A.

The following facts are derived from the records before the Warren Township Municipal Court and Law Division. Defendant was charged on September 15, 2022, with possessing a potentially dangerous dog following a series of events that occurred several days earlier for which the dog was impounded. Specifically, it is undisputed that on September 12, 2022, Koda, a German Shepherd, first attacked a delivery person, Kilen Roche, on defendant's driveway before he ran onto a neighbor's property and fatally attacked their small dog, Bella. It is also undisputed that Koda previously bit Saifullah Siddiqi, a serviceperson working on defendant's property, in July 2022 and, in a separate incident in August 2020, a leashed dog, Coco, as its owner walked Coco in the street by defendant's residence.

2

Roche testified he was making a delivery at defendant's home[1] and encountered two German Shepherds barking at him from the backyard. Defendant, also in the backyard, directed Roche to leave the box by the garage door. As he did so, he heard the back gate open and saw Koda, a "fully grown" dog, unleashed, "charging at [him]." He recounted Koda, bit his thigh causing "bad" pain and "a bit of a struggle" as defendant "tr[ied] to hit the dog with a toy and . . . sa[id s]top," before the dog ran away "across the street."

Roche got into his delivery van and proceeded to stop across the street. He saw "[Koda] with [Bella] in [his] mouth," on the front lawn of her owners', Kelly and James Palaia's home. James testified that he heard screaming and went outside to find defendant "kneeling four feet off [his] patio with . . . both hands bloody, [and] her right hand stopping two German Shepherds." He testified Koda "lunged at him" and he observed "blood just spitting out [of Bella] every time she . . . took a breath." The Palaias both testified that they attempted to summon medical attention for Bella and applied pressure to Bella's wounds as she bled profusely while "still breathing." The Palaias rushed Bella to the animal hospital where she eventually died.

---

[1] Apparently, Roche mistakenly delivered this package, intended for a neighbor, to defendant's address.

A-0061-23

Responding police and paramedics cleaned Roche's wound, and Roche explained that he later went to the hospital in "excruciating pain." Defendant told police she did not know how Koda got through her backyard gate. Defendant sustained a puncture wound on her hand and a laceration on her arm attempting to stop the attack.

Roche described walking with a cane in the aftermath of the incident and experiencing lingering daily shooting pain and weakness in his injured leg. Roche explained he no longer "ha[d] the same power in [his] leg as [he] used to before the incident," and he "used to play soccer" but he did not "believe that [he] ha[d] the power in [his] leg to play" anymore.

Defendant claimed that Koda "chased [Roche] because . . . [Koda] was feeling threatened and . . . anxious" and defendant "checked if [Roche] was okay" before running after Koda. Defendant testified that Bella had a history of coming onto defendant's property in which she "pee[d] on [defendant's] mailbox" between five and ten times and "poop[ed] on [defendant's] lawn . . . in front of Koda," also "nip[ping] Koda's feet" and coming onto defendant's property "three or four times." She claimed Bella tried to "bite back" during the attack and defendant injured herself when she "put [her] hand in Koda's mouth to pry it open."

A-0061-23

The State presented testimony regarding prior incidents involving Koda. Siddiqi testified that in July 2022, he was providing pest control services at defendant's property. When no one responded at the door, Siddiqi saw defendant and then, without defendant's direction, entered the rear yard to begin the treatment as is protocol. While starting to "spray . . . pesticide[] on the bushes and the grass," Siddiqi testified he "s[aw] the dogs" "just take off and start running towards [him]." Siddiqi stated one of the dogs barked at him while the other barked and "went for [his] . . . right leg[,] and [the dog] started to bite at it." Siddiqi testified he "scream[ed] under attack" and "ripped [his] leg from [the dog's] mouth and . . . hopped on the HVAC system and . . . [over] the fence." Siddiqi recalled defendant was "screaming at [him], telling [him] . . . it was [his] fault," and she had "no sympathy for [him]."

After the incident, Siddiqi testified he "called Animal Control . . . and the police" to report what happened and sought medical treatment at New Jersey Medical Center where he received "rabies shots and one or two stitches." Siddiqi testified that "[his] ligament was hurting, . . . [his] muscle was hurting," and "to [that] day . . . it still hurt[s him]," especially in "bad weather" or if he's "standing too long."

5

Defendant disputed Siddiqi's account and indicated she "yelled at [Siddiqi] to stop," to prevent him from coming into her yard.

Another witness, Shilpa Solanki, testified she was walking her "[sixteen-] pound dog" Coco on a leash in August 2020 on the street in front of defendant's home one morning when Koda, again unleashed, "attac[k]ed [her] dog from behind." She tried to pull Coco away but Koda "attacked one more time." Solanki explained she "held [her] dog in [her] hands and [Koda] again attacked and bit [her] dog." Coco was treated for eight to ten bite marks and administered a rabies shot. Defendant was apologetic and offered to pay the costs of Coco's care, which Solanki declined.

Defendant did not dispute that Koda bit Coco twice, but claimed Coco first growled at Koda.

Defendant and her husband, Sriram Ramanathan, each testified that Koda was well trained, performed "extremely well" in temperament testing, walked well on a leash, and was well behaved with other dogs. They also stated Koda had received training and good behavior certificates.

Defendant presented several witnesses regarding Koda's temperament. The animal control officer who issued the summonses testified that Koda was impounded without incident, and she did not recall "anything catastrophic

6

happening." A neighbor testified that she consistently saw defendant and her husband "playing and training with the dogs." Another witness familiar with canine behavior testified he observed Koda did not exhibit a prey drive and was "very good" with other dogs and cats. An animal rescue volunteer acquainted with defendant and her husband described Koda as "very sweet" and "very well trained."

## B.

The municipal court judge found the State established by clear and convincing evidence that Koda was potentially dangerous "under the statute . . . for a number of reasons." The judge recounted the testimony, finding Roche's testimony "highly credible" and stated "that instance alone . . . constitute[d] an unprovoked attack." He similarly credited Roche's description of his lasting pain and physical limitations on movement.

The judge also determined the State proved Koda's attack of Bella was unprovoked. The judge found the credible testimony of Roche and the Palaias established that Koda attacked and killed Bella on the Palaias' property and regarded defendant's testimony that Bella's past conduct provoked Koda as "not very strong" and "obviously for self-preservation purposes." The judge cited the testimony of Solanki finding her account credible regarding the earlier

7

"unprovoked" attack on Coco, although recognizing the incident was remote in time.

Describing Siddiqi's testimony as that of someone with "zero motive to lie," the judge found he too "was attacked, that he did everything that he could possibly have done, [and] thought the property was clear." The judge deemed defendant's testimony regarding the Siddiqi incident not in "any way credible."

Although the judge accepted testimony from defense witnesses to conclude that Koda "was a trained dog for the most part," the judge found the future risk too great given the proven repeated incidents of uncontrolled behavior. The judge concluded that the State met its burden of proof under both alternative sections of N.J.S.A. 4:19-23(a), requiring proof that Koda was "potentially dangerous" either because he (1) "caused bodily injury to a person during an unprovoked attack, and pose[d] a serious threat of serious bodily injury or death to a person," N.J.S.A. 4:19-23(a)(1), or (2) "caused serious bodily injury to another domestic animal or killed another domestic animal," and "(a) pose[d] a serious threat of serious bodily injury or death to a person, or (b) pose[d] a serious threat of death to another domestic animal," N.J.S.A. 4:19-23(a)(1) and (2).

A-0061-23

The judge then imposed the mandatory protective provisions of the statute, including required signage, fencing, locked enclosures, insurance, registration, and other identifiers. Those conditions include that defendant have a "registration number tattooed upon the dog in a prominent location." N.J.S.A. 4:19-24(a)(1).

Defendant requested the judge to "stay [the tattoo requirement] so that [defendant could] appeal it and . . . that part might be overturned." In requesting the stay, defense counsel stated only that "it's hard to find a veterinarian [who would] tattoo [a] dog" and "there [were] other ways of identifying the dog" including a "microchip." When the court inquired further, counsel indicated that "tattoo artists" tattoo dogs without anesthesia. The court cited the mandatory language of the statute stating the court "shall" order the tattoo; thus, the court imposed the tattoo requirement and denied the request for a stay. The court ordered a temperament evaluation of the dog before release.

## C.

Defendant appealed to the Law Division. Prior to the hearing, the Law Division granted a stay of the tattoo requirement. No record of that order to show cause hearing or the court's findings beyond the order was provided on appeal. Defendant's appendix includes a certification of defendant dated March

17, 2023, with no corresponding filing date or accompanying brief, which states a tattoo is "(a) cruel, (b) irreparable, (c) impossible to implement since . . . no veterinarian [would] perform the procedure[,] and (d) unnecessary" as Koda already had a microchip as a "means of identification."

Before the Law Division, defendant asserted that the municipal court judge erred in finding Koda to be potentially dangerous. Defendant emphasized the post-disposition temperament assessment found Koda had no reaction to other dogs in the shelter when tested. Defendant argued: (1) the Law Division owed no deference to the municipal court judge's flawed credibility determinations; (2) the municipal court judge failed to consider Koda's "character, training, [and] condition" and was guided by emotion over the death of Bella, improperly disregarding years of "provocation" by Bella; (3) the summons lacked sufficient detail regarding the specific allegations; and (4) the evidence was insufficient to demonstrate a serious threat of serious bodily injury or death to a human or domestic animal.

The State argued that the municipal court judge's credibility findings were rooted in the record as was the finding of potential dangerousness given Koda's "escalating pattern of violence which eventually reached the level of the death of a companion animal."

A-0061-23

The court affirmed the conviction in an August 21, 2023 order and written decision. The court gave deference to and accepted the municipal court judge's findings that:

> (1) . . . Roche was the most reliable witness[;] (2) [defendant]'s testimony was disingenuous[;] (3) . . . Solanki's testimony regarding [C]oco was more remotely relied upon while still credible[;] (4) the Pa[]laia[]s' testimony regarding Bella was credible and provided context[;] (5) the defense demonstrated that Koda was trained, and certified as a "good boy"[;] and (6) that despite training and certifications, Koda still acted in a dangerous manner based on the credible testimony of victims and eyewitnesses.

The court concurred Koda, unprovoked, caused bodily injury to Roche and attacked and killed Bella. The court rejected defendant's claims that Bella had provoked Koda in the past and "d[id] not accept the argument that Koda believed Roche to be a trespasser," because he was "lawfully present [on defendant's property] at the time of Koda's attack on him." The court found Koda also attacked Coco without provocation and "caused bodily injury to . . . Siddiqi while he was merely doing his job on [defendant]'s property," agreeing that "Siddiqi . . . ha[d] zero motive to lie in this matter."

The court also found "ample evidence of bodily injury to the victims from the incident on September 12[], 2022," citing Roche's treatment by paramedics and his hospital visits and "continued pain which required the involvement of

11

'pain and bone doctors'" due to "shooting pains" "[o]n a daily basis" and "his left [leg giving] out on [him] sometimes."

Finally, the Law Division agreed with the municipal court that "there [wa]s a threat of future bodily injury to people and future serious bodily injury to domestic animals/pets" based "on the prior acts involving . . . Siddiqi and Coco."

Defendant filed a timely appeal.[2]

## II.

Defendant advances the following arguments on appeal:

POINT I

SUMMARY OF STATUTES, STANDARD OF REVIEW, AND CREDIBILITY

POINT II

THE STATE DID NOT PROVE BY CLEAR AND CONVINCING EVIDENCE THAT KODA IS POTENTIALLY DANGEROUS

---

[2] We note that defendant's appendix reflects that defendant subsequently filed a "motion to vacate" and sought to stay the imposition of the tattoo requirement pending this appeal. No record has been provided of these proceedings below, but included in defendant's appendix is a September 21, 2023 order granting the stay pending the motion to vacate, and a November 16, 2023 order denying the motion to vacate "as exclusive jurisdiction remains with the Appellate Division."

A. The State did not prove by clear and convincing evidence that Koda pose[d] a serious threat of serious bodily injury or death to human[s] or a serious threat of death to another domestic animal.

B. The State did not prove that Roche's injury was unprovoked.

C. The State did not prove the elements of [N.J.S.A.] 4:19-23(a)(2).

D. Temperament evidence urges the opposite result of State v[.] Herold[, No. A-4329-17 (App. Div. Feb. 27, 2019) (slip op. at 11)].

POINT III

THE TATTOO REQUIREMENT IS UNCONSTITUTIONALLY VAGUE, ANTIQUATED, IMPOSSIBLE AND UNNECESSARY

Defendant raises the following additional points in her reply brief:

POINT I

NEITHER OF THE LOWER COURTS FOUND A "SERIOUS THREAT."

A. Mischaracterizations of the courts' decisions below.

POINT II

THE STATE MISREPRESENTED FACTS IN THE RECORD.

13

POINT III

THE PRIOR INCIDENTS WITH SIDDIQI AND COCO ARE NOT PROBATIVE OF A "SERIOUS RISK."

POINT IV

IT IS THE STATE'S BURDEN TO SHOW KODA POSES A SERIOUS THREAT, NOT THE DEFENDANT'S BURDEN TO PROVE THE OPPOSITE.

III.

On appeal after de novo review by the Law Division of a municipal court decision, this court "consider[s] only the action of the Law Division and not that of the municipal court." State v. Oliveri, 336 N.J. Super. 244, 251 (App. Div. 2001) (citing State v. Joas, 34 N.J. 179, 184 (1961)); see also R. 3:23-8(a)(2). This court's review is therefore "exceedingly narrow," State v. Locurto, 157 N.J. 463, 470 (1999), and deferential to "the factual findings of the Law Division and the municipal court," and considers whether the Law Division's de novo factual findings "could reasonably have been reached on sufficient credible evidence present in the record," State v. Stas, 212 N.J. 37, 48-49 (2012) (quoting Locurto, 157 N.J. at 471). "When the reviewing court is satisfied that the findings and result meet this criterion, its task is complete and it should not disturb the result . . . ." State v. Johnson, 42 N.J. 146, 162 (1964).

14

This court "owes 'deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Stas, 212 N.J. at 49 (quoting Locurto, 157 N.J. at 471). "However, no such deference is owed to the Law Division or the municipal court with respect to legal determinations or conclusions reached on the basis of the facts." Ibid.

IV.

A.

We first address defendant's claims that there was insufficient evidence to support the finding that Koda is a potentially dangerous dog. N.J.S.A. 4:19-23(a) provides, in pertinent part, that the trial court

> shall declare a dog to be potentially dangerous if it finds by clear and convincing evidence that the dog:
>
>> (1) caused bodily injury to a person during an unprovoked attack, and poses a serious threat of serious bodily injury or death to a person; [or]
>>
>> (2) caused serious bodily injury to another domestic animal or killed another domestic animal, and
>>
>>> (a) poses a serious threat of serious bodily injury or death to a person, or

15

(b) poses a serious threat of death to
another domestic animal.

Here, we conclude there was ample evidence in the record to support the Law Division's findings that Koda satisfied both alternative statutory bases. See N.J.S.A. 4:19-23(a)(1) and (2).

First, the record supports the court's finding that Koda, unprovoked, caused both bodily injury to Roche and killed Bella. As to Roche, it was undisputed that Roche never entered the gate into the backyard of defendant's residence and instead placed the package he was delivering, as directed by defendant, near the garage when Koda "charg[ed]" at Roche and bit him. Defendant then struck Koda who eventually released his grip on Roche, turning his attention to Bella.

Bodily injury is defined as "physical pain, illness, or any impairment of physical condition." N.J.S.A. 2C:11-1(a). The record supports the court's finding Roche suffered acute "excruciating pain" at the time and in the aftermath of the attack endured residual injury that lingers today. We are unpersuaded by defendant's argument that the degree of injury required expert testimony.

We also conclude that the court's finding that Koda killed Bella—who was on the Palaia's property and did not provoke the aggression—was sufficiently anchored in the record. Although Bella may have in the past wandered off the

16

property, we perceive no reasonable argument on this record that Bella caused or provoked Koda's fatal attack.

Next, we reject defendant's argument that the record did not sufficiently support a finding that Koda "poses a serious threat of serious bodily injury or death to a person," or "a serious threat of death to another domestic animal." The Law Division found the history of prior attacks of Siddiqi and Coco, together with the September 2022 attacks, sufficient to satisfy both these alternative requirements.

Affording appropriate deference to the Law Division's findings we are satisfied the court's determinations were sufficiently supported by the evidence. Here, the court reviewed the record and agreed "there is a threat of future bodily injury to people and future serious bodily injury to domestic animals/pets."

Again, based on Koda's prior attacks, we are unpersuaded expert opinion was needed to conclude that a serious future threat of serious bodily injury to persons existed. See N.J.S.A. 2C:11-1(b) (defining serious bodily injury as "bodily injury which creates a substantial risk of death[,] or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"). In four separate attacks spanning less than three years, two humans and one dog were injured, and another dog

17

was killed. Defendant herself was also injured when she attempted to restrain Koda. This court will not disturb the Law Division's finding by clear and convincing evidence that the requisite risk of future harm was present.

In addition, the record supports the alternative finding that Koda killed Bella and posed "a serious threat of death to another domestic animal." The attacks on both Coco and Bella reflect that Koda attacked those animals and did not release his grasp until a person intervened. The court did not err in finding Koda, regardless of training and other periods of controlled behavior, posed a risk of future similar uncontrolled behavior creating a serious threat of death to a domestic animal.

Although the Law Division did not use the term "serious" to qualify the level of threat, that does not alter our conclusion because the serious threat is readily drawn from the record as discussed in detail in the court's findings. We similarly disagree with defendant's claim that the court ignored Koda's prior history of training and his satisfactory temperament assessments. The court identified and addressed this mitigating information and nevertheless determined Koda persisted in dangerous conduct threatening and injuring persons and animals.

A-0061-23

Defendant's constitutional challenge to the tattoo requirement was never formally raised or explored before either the municipal court judge or the Law Division beyond the requests for a stay pending appeal. Thus, we conclude both the municipal court and the Law Division properly relied on the plain language of the statute in declining to depart from the mandated tattoo provision.

The statute provides in pertinent part:

> If the municipal court declares the dog to be potentially dangerous, it <u>shall</u> issue an order and a schedule for compliance which, in part:
>
> > (a) <u>shall</u> require the owner to comply with the following conditions:
> >
> > (1) . . . The owner <u>shall</u>, at his own expense, have the registration number tattooed upon the dog in a prominent location.
>
> [N.J.S.A. 4:19-24(a)(1) (emphases added).]

Clearly, the provision makes this safeguard mandatory, and neither the municipal court nor the Law Division erred in imposing the condition.

Defendant now asserts on appeal that the statute is "unconstitutionally vague, antiquated, impossible and unnecessary," but briefed only the vagueness argument, which we address and reject.

19

A-0061-23

"Appellate courts apply a de novo standard when determining the constitutionality of a statute." State v. Dalal, 467 N.J. Super. 261, 280 (App. Div. 2021) (citing State v. Hemenway, 239 N.J. 111, 125 (2019)). Every statute contains "a presumption of validity." State v. Lenihan, 219 N.J. 251, 266 (2014). This deference means "any act of the Legislature will not be ruled void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." Ibid. (quoting State v. Muhammed, 145 N.J. 23, 41 (1996)). A law will be upheld "[e]ven where a statute's constitutionality is 'fairly debatable.'" Ibid. (quoting Newark Superior Officers Ass'n v. City of Newark, 98 N.J. 212, 227 (1985)).

"A statute 'is void if it is so vague that persons of "common intelligence must necessarily guess at its meaning and differ as to its application."'" Id. at 267 (quoting Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 279-80 (1998)). Vagueness in a statute poses a constitutional issue in that it "may create a denial of due process due to a failure to provide adequate and fair notice or warning." Ibid.

Here, applying these principles to the sparse record before us related to the tattoo process, we are not persuaded that the statute's failure to identify the precise "prominent location" for the tattoo rises to a level of constitutionally impermissible uncertainty.

The remaining challenges regarding "cruelty," "antiquity," and "impossibility" were not sufficiently raised before the municipal court or Law Division nor are they properly raised here. Therefore, we will not address them. From the record, it appears defendant merely asked for a stay of the tattoo provision at the time of sentencing and later before the Law Division so that defendant could "appeal it and . . . that part might be overturned." As such, there is no record before us to review these issues. See State v. Robinson, 200 N.J. 1, 20 (2009) ("[I]t is a well-settled principle that . . . appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation [wa]s available." (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973))). Accordingly, on this limited record, we affirm the imposition of the tattoo safeguard.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21